**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| ROBERT JEREMY HORTON, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>GAMESTOP CORP., d/b/a GAME INFORMER,<br><br>    Defendant. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

On behalf of himself and all others similarly situated, Plaintiff Robert Jeremy Horton, also known as Jeremy Horton, complains and alleges as follows based on personal knowledge as to himself, on the investigation of his counsel, and on information and belief as to all other matters:

**NATURE OF THE ACTION**

1. Plaintiff brings this action for legal and equitable remedies resulting from the illegal actions of GameStop Corp. ("GameStop" or "Defendant") in selling his personal reading information and the personal reading information of other Michigan residents to numerous third-party marketing, list-rental, and data-mining companies between May 29, 2015 and July 30, 2016, in violation of Michigan's Video Rental Privacy Act, H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg., Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (hereinafter, the "VRPA").

2. GameStop is a video game, consumer electronics, and wireless services retailer, as well as the publisher of the video-game magazine *Game Informer*.

3. To supplement its revenues, GameStop sold the personal information of all *Game Informer* subscribers to data miners and other third parties, without its subscribers' written consent, at various times between May 29, 2015 and July 30, 2016. The information GameStop sold included the full names of individuals who then subscribed or had previously subscribed to *Game*

*Informer* (collectively "subscribers" or "customers," and individually a "subscriber" or "customer"), the title of the publication subscribed to (i.e., *Game Informer*), and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information.

4. GameStop's disclosures of Personal Reading Information, and other personal, demographic, and lifestyle information, allows for highly specific targeting of groups of individuals. For example, anyone could buy a customer list provided by GameStop that contains the names and addresses of all *Game Informer* subscribers who are women, play video games on both a Game Boy Advance and a Microsoft Xbox, are over the age of 30 and make over $80,000.00 per year. Such a list would cost approximately $135.00 per thousand subscribers listed.

5. While GameStop profits handsomely from the unauthorized sale and disclosure of its customers' Personal Reading Information and other personal and demographic information, it does so without regard for its subscribers' privacy interests in such information. Indeed, GameStop does not obtain its customers' consent, written or otherwise, prior to selling their Personal Reading Information.

6. By selling the Personal Reading Information of its Michigan-based subscribers without their written consent between May 29, 2015 and July 30, 2016, GameStop violated the VRPA, which prohibits companies from disclosing to a third party any record or information concerning a Michigan customer's purchase of written materials that identifies the customer, absent the customer's written consent.

7. Accordingly, Plaintiff brings this Class Action Complaint against GameStop for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, and for its unjust enrichment at the expense of its own subscribers.

## PARTIES

8. Plaintiff Robert Jeremy Horton is a natural person and citizen of Kalamazoo, Michigan.

9. Defendant GameStop Corp. is, and at all times mentioned herein was, a Delaware corporation with its headquarters and principal place of business in Grapevine, Texas. GameStop does business in the State of Michigan and throughout the United States.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over this putative class action lawsuit pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from GameStop.

11. This Court has personal jurisdiction over GameStop because it is registered to, and regularly does, conduct business in this District, including by soliciting business from, and entering into transactions with, consumers located in this District. Further, the unlawful conduct alleged in this Class Action Complaint occurred in, was directed at, and/or emanated from this District.

12. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in this District. Venue is additionally proper because Plaintiff resides within this District and GameStop conducts significant business in this District, including soliciting consumer business and entering into consumer transactions in this District.

## FACTUAL BACKGROUND

### I. Michigan's Video Rental Privacy Act

13. In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

14. That same year, in recognition of the need "to preserve [its citizens] personal privacy with respect to the purchase, rental, or borrowing of certain materials," Michigan's

3

legislature enacted the VRPA, which prohibits companies from disclosing certain types of sensitive consumer information without the consumer's written consent. VRPA §§ 1-4.[1]

15. Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

VRPA § 2 (emphasis added).

16. Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy – of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100-599, at 6 (Statement of Rep. McCandless).

17. As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the federal Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Senator Leahy further explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood. They

---

[1] In May 2016, the Michigan legislature amended the statute. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at VRPA § 1, *et seq*.). The May 2016 amendment, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the VRPA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)); *see also*, *e.g.*, *Coulter-Owens v. Time Inc.*, No. 16-1321, 695 Fed. Appx. 117, 120-21, 2017 WL 2731309, at *3 (6th Cir. June 26, 2017); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 628-33 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc*., 235 F. Supp. 3d 868, 873-76 (E.D. Mich. 2017); *Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 593-96 (S.D.N.Y. 2016). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the statute, the pre-amendment VRPA applies in this case.

reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

18. Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." Privacy: Sales, Rentals of Videos, etc., House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (a copy of which is attached hereto as Exhibit "A").

19. Despite the fact that thousands of Michigan residents subscribe to *Game Informer*, GameStop chose to disregard its legal obligations under the VRPA to these subscribers by systematically disclosing their Personal Reading Information to third parties between May 29, 2015 and July 30, 2016.

**II.     Consumers' Personal Information Is a Valuable Commodity**

20. In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

21. More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

22. The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that: "Most consumers cannot begin

---

[2]     The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited April 29, 2018).

[3]     *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited April 29, 2018).

5

to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit."[4]

23. In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers. Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

24. The scope of data miners' knowledge about consumers is immense. As noted by *The New York Times* in 2012, "[i]f you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

25. Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

26. Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus sent

---

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited April 29, 2018).

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited April 29, 2018).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited April 29, 2018).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited April 29, 2018).

a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

27. In his letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

28. Data mining is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams[10], including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like GameStop share information with data miners and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

29. Information disclosures like GameStop's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent

---

[8] See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information, Website of Senator Ed Markey (July 25, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited April 29, 2018).

[9] *Id.*

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited April 29, 2018).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, The New York Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited April 29, 2018).

[12] *Id.*

telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

30. Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like GameStop's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

31. Most recently, Cambridge Analytica, a British data-mining and data-analytics company, was revealed to have collected the data of approximately 87 million Facebook users, and then used that data, together with data from various other sources, to create psychographic profiles of people that could be used to influence voter opinion on behalf of politicians who hired them.[15]

32. Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. GameStop is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### III. Consumers Value Their Privacy and Consider Companies' Privacy Practices When Making Purchases

33. As the data mining industry has grown, so too have consumer concerns regarding the privacy of personal information.

---

[13] *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited April 29, 2018).

[14] *Id.*

[15] Rosenberg, Matthew; Confessore, Nicholas; Cadwallader, Carole, *How Trump Consultants Exploited the Facebook Data of Millions*. The New York Times, March 17, 2018, *available at* https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html (last visited April 29, 2018).

34. Consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

35. A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

36. In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[18] These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[19]

37. Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20] As such, where a business

---

[16] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last visited April 29, 2018).

[17] *Id.*

[18] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited April 29, 2018).

[19] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited April 29, 2018).

[20] See Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125 (last visited April 29, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

9

offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### IV.     GameStop Unlawfully Sells its Subscribers' Personal Reading Information

38.     GameStop maintains a vast digital database comprised of its subscribers' Personal Reading Information. Between May 29, 2015 and July 30, 2016, GameStop disclosed its subscribers' Personal Reading Information to data mining companies, who then supplemented that information with additional sensitive personal, lifestyle, and demographic information about each GameStop subscriber.  *See, e.g.,* Exhibit "B" hereto.

39.     GameStop then sold its mailing lists – which included subscribers' Personal Reading Information identifying them as purchasers of *Game Informer*, as well as other sensitive information obtained from data miners – to consumer-facing businesses, marketing companies, other data miners, and the list goes on. *See id.*

40.     As a result of GameStop's data compiling and sharing practices, companies can purchase mailing lists from GameStop that identify *Game Informer* subscribers and disclose other personal details of those subscribers, such as the types of video gaming systems they own, their areas of interest in the gaming industry, their age and gender, and their income. GameStop's disclosure of such personal information puts consumers at risk of serious harm from scammers.

41.     GameStop failed to seek its subscribers' prior written consent to any of these disclosures between May 29, 2015 and July 30, 2016, and subscribers remain unaware that their Personal Reading Information and other sensitive personal information has been bought and sold on the open market.

42.     Consumers sign up for *Game Informer* subscriptions through numerous media outlets, including the Internet, telephone, traditional mail, and even in store at a GameStop location. Regardless of how the consumer subscribed, GameStop uniformly failed to obtain any form of consent from – or even provided effective notice to – its subscribers before disclosing their Personal Reading Information between May 29, 2015 and July 30, 2016.

43. As a result, between May 29, 2015 and July 30, 2016, GameStop disclosed its the Personal Reading Information of *Game Informer* subscribers– including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to anybody willing to pay for it.

44. By and through these actions, GameStop intentionally disclosed to third parties the Personal Reading Information of its Michigan subscribers, including of Plaintiff and all other members of the Class, without the requisite consent, in direct violation of the VRPA.

### ALLEGATIONS RELATING TO PLAINTIFF ROBERT JEREMY HORTON

45. Plaintiff is, and at all times referenced herein was, a citizen and resident of the State of Michigan.

46. Plaintiff purchased a one-year subscription to *Game Informer* from GameStop in or about 2010. Plaintiff purchased his subscription with money.

47. Plaintiff purchased a one-year subscription to *Game Informer* from GameStop in or about 2013, and he has renewed his subscription in the years since. Plaintiff purchased his subscriptions with money.

48. Plaintiff never agreed in writing or otherwise to allow GameStop to sell or disclose his Personal Reading Information to any unrelated third parties.

49. Plaintiff did not receive notice of such disclosures before GameStop disclosed his Personal Reading Information to third parties.

50. At various times between May 29, 2015 and July 30, 2016, GameStop disclosed Plaintiff's Personal Reading Information (i.e., information that identifies Plaintiff as having purchased a subscription to *Game Informer*), without obtaining his permission or providing him prior notice, to data mining companies, who appended the information with data from their own records.

---

[21] California's Reader Privacy Act Signed into Law, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited April 29, 2018).

51. During this same time period, GameStop also disclosed Plaintiff's Personal Reading Information to other third-party companies, including so-called "database cooperatives" without first obtaining his consent or giving him prior notice of the disclosures.

52. GameStop's disclosures of Plaintiff's Personal Reading Information between May 29, 2015 and July 30, 2016 constituted clear violations of the VRPA.

53. Further, and even though it lacked permission to even disclose his Personal Reading Information in the first place, GameStop profited from its disclosures of Plaintiff's Personal Reading Information.

54. Because GameStop sold and disclosed his Personal Reading Information between May 29, 2015 and July 30, 2016, Plaintiff now receives junk mail and telephone solicitations to his residence. These unwarranted offers waste Plaintiff's time, money, and resources. These harassing junk mail offerings and phone call solicitations received by Plaintiff are attributable to GameStop's unauthorized sale and disclosure of his Personal Reading Information, and they invaded Plaintiff's privacy.

55. Because Plaintiff is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription to *Game Informer*, GameStop's sale of his Personal Reading Information deprived Plaintiff of the full set of benefits to which he was entitled as a part of his *Game Informer* subscription, thereby causing economic harm. Accordingly, what Plaintiff received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Game Informer* subscription had he known that GameStop would disclose his Personal Reading Information.

## CLASS ACTION ALLEGATIONS

56. Plaintiff seeks to represent a class defined as all Michigan residents who, at any point in time between May 29, 2015 and July 30, 2016, had their Personal Reading Information disclosed to one or more third parties by GameStop without having provided GameStop their prior

written permission to make such disclosures (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

57. Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but are readily determinable in GameStop's records through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

58. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether GameStop is "engaged in the business of selling at retail" books or other written materials (i.e., magazines); (b) whether GameStop obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether GameStop's disclosure of Plaintiff's and the Class's Personal Reading Information violated the Video Rental Privacy Act, VRPA § 2; and (d) whether GameStop's sale of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

59. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

60. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

61. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of the VRPA**
**(On Behalf of Plaintiff and the Class)**

62. Plaintiff repeats the allegations contained in paragraphs 1-61 as if fully set forth herein.

63. Plaintiff brings this claim individually and on behalf of members of the Class against GameStop.

64. Because GameStop is a magazine publisher that sells subscriptions to consumers, GameStop is engaged in the business of selling written materials at retail. *See* VRPA § 2.

65. By purchasing a subscription to *Game Informer*, Plaintiff purchased written materials at retail from GameStop. *See* VRPA § 2.

66. Because Plaintiff purchased written materials at retail from GameStop, Plaintiff is a "customer" within the meaning of the VRPA. *See* VRPA § 1(a).

67. At various times between May 29, 2015 and July 30, 2016, GameStop disclosed to third parties Plaintiff's Personal Reading Information, which identified him as a subscriber of *Game Informer*, in at least two ways.

68. First, GameStop disclosed, at various times between May 29, 2015 and July 30, 2016, customer mailing lists containing Plaintiff's Personal Reading Information to various data

14

mining companies (including, on information and belief, Acxiom, Experian, and/or various others), who then supplemented those lists with additional sensitive personal, lifestyle, and demographic information from their own databases, before sending the lists back to GameStop.

69. Second, at various times between May 29, 2015 and July 30, 2016, GameStop sold its customer mailing lists containing Plaintiff's Personal Reading Information – enhanced with additional personal, demographic and lifestyle information added by the data miners – to other third-party companies, including NextMark, which in turn sold and/or disclosed those lists and that information to numerous other parties, including direct-mail advertisers and even other publishers.

70. The customer mailing lists containing additional information appended from data miners were more valuable to GameStop and could be sold by GameStop for more money. Accordingly, the sales of such lists increased GameStop's profits.

71. Plaintiff is informed and believes, and thereupon alleges, that at various times between May 29, 2015 and July 30, 2016, GameStop also disclosed customer mailing lists containing Plaintiff's Personal Reading Information to other publishers in return for lists of names, addresses and other contact information pertaining to "prospects", i.e., individuals who do not presently subscribe to *Game Informer* but who, based on certain personal demographic information, GameStop and its affiliates have deemed likely to subscribe if presented with the opportunity to do so via direct marketing by GameStop. Lists of "prospects" have significant value to publishers such as GameStop.

72. By selling or otherwise disclosing for value its subscriber lists between May 29, 2015 and July 30, 2016, GameStop disclosed to persons, other than Plaintiff, records or information concerning Plaintiff's purchases of written materials from GameStop. *See* VRPA § 2.

73. The records or information GameStop disclosed to third parties between May 29, 2015 and July 30, 2016 indicate Plaintiff's name and address(es), as well as the fact that he subscribed to *Game Informer*. Accordingly, the records or information disclosed to third parties

by GameStop between May 29, 2015 and July 30, 2016 indicate Plaintiff's identity. *See* VRPA § 2.

74. Neither Plaintiff nor the members of the Class provided GameStop consent, written or otherwise, to disclose their Personal Reading Information to a third party at between May 29, 2015 and July 30, 2016.

75. Worse yet, neither Plaintiff nor the members of the Class received notice of GameStop's disclosures of their Personal Reading Information to third parties between May 29, 2015 and July 30, 2016.

76. GameStop's disclosures of Plaintiff's and the Class's Personal Reading Information between May 29, 2015 and July 30, 2016 were not made pursuant to a court order, search warrant, or grand jury subpoena.

77. GameStop's disclosures of Plaintiff's and the Class's Personal Reading Information between May 29, 2015 and July 30, 2016 were not made to collect payment for their subscriptions.

78. GameStop's disclosures of Plaintiff's and the Class's Personal Reading Information between May 29, 2015 and July 30, 2016 were made to third parties in order to increase GameStop's revenue, and were therefore not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

79. By disclosing Plaintiff's and the Class's Personal Reading Information between May 29, 2015 and July 30, 2016, GameStop invaded Plaintiff's and the Class's privacy in their reading habits. *See* VRPA § 2.

80. Additionally, because Plaintiff and the members of the Class paid for their subscriptions to *Game Informer*, and because GameStop was obligated to comply with the VRPA, GameStop's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information between May 29, 2015 and July 30, 2016 deprived Plaintiff and the Class members of the full value of their paid-for subscriptions. Because Plaintiff and the other Class members ascribed monetary value to the privacy of their Personal Reading Information, GameStop's

16

unlawful sale and disclosure of their Personal Reading Information between May 29, 2015 and July 30, 2016 caused Plaintiff and the Class members to receive less value than they paid for, thereby causing them economic harm.

81.     Likewise, because Plaintiff and the other Class members ascribed monetary value to the privacy of their Personal Reading Information, a subscription to *Game Informer* that keeps the subscriber's Personal Reading Information private is more valuable than one that does not.

82.     Accordingly, had Plaintiff been adequately informed of GameStop's disclosure practices in effect between May 29, 2015 and July 30, 2016, he would not have been willing to purchase his subscriptions to *Game Informer* at the price charged, if at all. Thus, GameStop's unlawful disclosures between May 29, 2015 and July 30, 2016 caused Plaintiff economic harm.

83.     GameStop's disclosure of Plaintiff's Personal Reading Information to third parties between May 29, 2015 and July 30, 2016 also caused an influx of third party print advertisements to his home and marketing calls to his telephone.

84.     GameStop's disclosures of the Personal Reading Information of Plaintiff and the members of the Class between May 29, 2015 and July 30, 2016 constituted clear violations of the VRPA and caused Plaintiff and the members of the Class to suffer privacy-based and economic injuries.  As a result of GameStop's unlawful disclosures between May 29, 2015 and July 30, 2016, Plaintiff and the other Class members are each entitled to recover actual damages, including disgorgement, or $5,000.00, whichever is greater, as well as costs and reasonable attorneys' fees. VRPA § 5(a).

85.     The right of Plaintiff and all other members of the Class to bring a claim for statutory damages of $5,000.00 under the VRPA accrued, and thus vested, at the time GameStop committed its violations of the VRPA between May 29, 2015 and July 30, 2016 by disclosing Plaintiff's and the other Class members' Personal Reading Information, as alleged herein.

86.     Therefore, on behalf of himself and the Class, Plaintiff seeks (1) actual damages, including disgorgement, or $5,000.00, whichever is greater, for himself and each Class member

17

pursuant to the VRPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to the VRPA § 5(b).

### SECOND CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

87. Plaintiff repeats the allegations contained in paragraphs 1-61 as if fully set forth herein.

88. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

89. Plaintiff and the Class members conferred benefits on GameStop by providing GameStop with their Personal Reading Information and paying GameStop for their subscriptions. GameStop received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to *Game Informer*.

90. Because GameStop received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because GameStop has employees handling customer accounts and billing as well as customer data, GameStop appreciates or has knowledge of such benefits.

91. Under the VRPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

92. Under principles of equity and good conscience, because GameStop failed to comply with the VRPA, GameStop should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by selling Plaintiff's and the Class's Personal Reading Information.

93. Plaintiff and the other Class members have suffered actual damages as a result of GameStop's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

94. Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as GameStop's failure to inform them that it would disclose their Personal Reading Information caused them to purchase subscriptions when they otherwise would not have.

95. Further, a portion of the purchase price of each GameStop subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the VRPA. Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive – i.e., confidentiality of their Personal Reading Information – and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

96. To prevent inequity, GameStop should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from GameStop's sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

97. Accordingly, Plaintiff and the Class members seek an order declaring that GameStop's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by GameStop through its sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Robert Jeremy Horton, individually and on behalf of all others similarly situated, prays that the Court enter judgment in his and the Class's favor and against Defendant GameStop Corp., and for the following relief:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B. For an order declaring that Defendant's conduct as described herein violated the VRPA;

C. For an order declaring that Defendant's conduct as described herein constituted unjust enrichment;

D. For an award of actual damages, including disgorgement and restitution, or $5,000.00, whichever is greater, to Plaintiff and each Class member, as provided by the VRPA;

E. For an order of restitution and all other forms of equitable monetary relief;

F. For prejudgment interest on all amounts awarded; and

G. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

By: s/ Wedad Ibrahim
Wedad Ibrahim (P81970)
LYNGKLIP & ASSOCIATES
CONSUMER LAW CENTER, PLC
Attorney For Robert Horton
24500 Northwestern Highway, Ste. 206
Southfield, MI 48075
(248) 208-8864
WedadI@MichiganConsumerLaw.Com

Dated: May 29, 2018

Frank S. Hedin*
fhedin@hedinhall.com
David W. Hall*
dhall@hedinhall.com
**HEDIN HALL LLP**
1395 Brickell Avenue, Suite 900
Miami, Florida 33131
Tel: (305) 357-2107
Fax: (305) 200-8801

* Pro Hac Vice Application Forthcoming

*Counsel for Plaintiff and the Putative Class*