## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROBERT JEREMY HORTON; MARK SCHOENROCK; JUSTIN GIBBS; and PATRICK MYERS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>GAMESTOP, INC.; and SUNRISE PUBLICATIONS, INC.,<br><br>        Defendants. | Civil Action No. 1:18-cv-00596-GJQ-PJG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

On behalf of themselves and all others similarly situated, Plaintiffs Robert Jeremy Horton, also known as Jeremy Horton, Mark Schoenrock, Justin Gibbs, and Patrick Myers complain and allege as follows based on personal knowledge as to themselves, on the investigation of their counsel, and on information and belief as to all other matters:

## NATURE OF THE ACTION

1.     Plaintiffs bring this action for legal and equitable remedies resulting from the illegal actions of GameStop, Inc. and Sunrise Publications, Inc. (collectively, "GameStop") in transmitting, disseminating, and/or otherwise disclosing their personal reading information and the personal reading information of other Michigan residents to numerous third-party companies, including data-mining companies between May 29, 2015 and July 30, 2016, in violation of Michigan's Video Rental Privacy Act, H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg., Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (hereinafter, the "VRPA").

2.     GameStop is a video game, consumer electronics, and wireless services retailer, as well as the publisher of the video-game magazine *Game Informer*.

3.      To supplement its revenues, GameStop transmitted, disseminated, and/or otherwise disclosed the personal information of all *Game Informer* subscribers to data miners and other third parties, without Plaintiffs' or its other subscribers' written consent, at various times between May 29, 2015 and July 30, 2016.   The information GameStop transmitted, disseminated, and/or otherwise disclosed included the full names of individuals who then subscribed or had previously subscribed to *Game Informer* (collectively "subscribers" or "customers," and individually a "subscriber" or "customer"), the title of the publication subscribed to (i.e., *Game Informer*), and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information.

4.      GameStop's disclosures of Personal Reading Information, and other personal, demographic, and lifestyle information, allows for highly specific targeting of groups of individuals.

5.      While GameStop profits handsomely from the unauthorized transmission, dissemination, and/or disclosure of its customers' Personal Reading Information and other personal and demographic information, it does so without regard for its subscribers' privacy interests in such information.  Indeed, GameStop does not obtain its customers' consent, written or otherwise, prior to transmitting, disseminating, and/or otherwise disclosing their Personal Reading Information.

6.      By transmitting, disseminating, and/or otherwise disclosing the Personal Reading Information of its Michigan-based subscribers without their written consent between May 29, 2015 and July 30, 2016, GameStop violated the VRPA, which prohibits companies from disclosing to a third party any record or information concerning a Michigan customer's purchase of written materials that identifies the customer, absent the customer's written consent.

7.      Accordingly, Plaintiffs bring this First Amended Class Action Complaint against GameStop for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, and for its unjust enrichment at the expense of its own subscribers.

## PARTIES

8.     Plaintiff Robert Jeremy Horton is a natural person and citizen of Kalamazoo, Michigan.

9.     Plaintiff Mark Schoenrock is a natural person and citizen of Chesterfield, Michigan.

10.     Plaintiff Justin Gibbs is a natural person and citizen of Holt, Michigan.

11.     Plaintiff Patrick Myers is a natural person and citizen of Ann Arbor, Michigan.

12.     Defendant GameStop, Inc. is, and at all times mentioned herein was, a Delaware corporation with its headquarters and principal place of business in Grapevine, Texas.  GameStop, Inc. does business in the State of Michigan and throughout the United States.

13.     Defendant Sunrise Publicantions, Inc. is, and at all times mentioned herein was, a Minnesota corporation with its headquarters and principal place of business in Grapevine, Texas. Sunrise Publications, Inc. does business in the State of Michigan and throughout the United States.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this putative class action lawsuit pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from GameStop, Inc. and from Sunrise Publications, Inc.

15.     This Court has personal jurisdiction over both GameStop, Inc. and Sunrise Publications, Inc. because each of them is registered to, and regularly does, conduct business in this District, including by soliciting business from, and entering into transactions with, consumers located in this District.  Further, the unlawful conduct alleged in this First Amended Class Action Complaint occurred in, was directed at, and/or emanated from this District.

Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in this District.  Venue is additionally proper because Plaintiff resides within this District and because both GameStop, Inc. and Sunrise

Publications, Inc. conduct significant business in this District, including soliciting consumer business and entering into consumer transactions in this District.

## FACTUAL BACKGROUND

### I.      Michigan's Video Rental Privacy Act

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     That same year, in recognition of the need "to preserve [its citizens] personal privacy with respect to the purchase, rental, or borrowing of certain materials," Michigan's legislature enacted the VRPA, which prohibits companies from disclosing certain types of sensitive consumer information without the consumer's written consent. VRPA §§ 1-4.[1]

18.     Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

---

[1]      In May 2016, the Michigan legislature amended the statute. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at VRPA § 1, *et seq*.). The May 2016 amendment, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the VRPA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)); *see also, e.g.*, *Coulter-Owens v. Time Inc.*, No. 16-1321, 695 Fed. Appx. 117, 120-21, 2017 WL 2731309, at *3 (6th Cir. June 26, 2017); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 628-33 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873-76 (E.D. Mich. 2017); *Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 593-96 (S.D.N.Y. 2016). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the statute, the pre-amendment VRPA applies in this case. *See* 9/28/18 Opinon and Order Denying Motion to Dismiss (ECF No. 18), at 4 ("Thus, the unamended VRPA applies to Plaintiff's claims that accured prior to July 31, 2016.").

VRPA § 2 (emphasis added).

19.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy – of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100-599, at 6 (Statement of Rep. McCandless).

20.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the federal Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).  Senator Leahy further explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

21.     Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." Privacy: Sales, Rentals of Videos, etc., House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (a copy of which is attached hereto as Exhibit "A").

22.     Despite the fact that thousands of Michigan residents subscribe to *Game Informer*, GameStop chose to disregard its legal obligations under the VRPA to these subscribers by systematically disclosing their Personal Reading Information to third parties between May 29, 2015 and July 30, 2016.

## II.      Consumers' Personal Information Is a Valuable Commodity

23.      In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

24.      More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

25.      The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that: "Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit."[4]

26.      In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers. Data miners then profit by transmitting, disseminating, and/or otherwise disclosing this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

---

[2]      The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited April 29, 2018).

[3]      *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited April 29, 2018).

[4]      Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited April 29, 2018).

[5]      *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited April 29, 2018).

27.     The scope of data miners' knowledge about consumers is immense.  As noted by *The New York Times* in 2012, "[i]f you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

28.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

29.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

30.     In his letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

31.     Data mining is especially troublesome when consumer information is transmitted, disseminated, and/or otherwise disclosed to direct-mail advertisers. In addition to causing waste

---

[6]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited April 29, 2018).

[7]     Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited April 29, 2018).

[8]     See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information, Website of Senator Ed Markey (July 25, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited April 29, 2018).

[9]     *Id.*

and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams[10], including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like GameStop share information with data miners and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

32.    Information disclosures like GameStop's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]    The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

33.    Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like GameStop's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

34.    Most recently, Cambridge Analytica, a British data-mining and data-analytics company, was revealed to have collected the data of approximately 87 million Facebook users,

---

[10]    *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited April 29, 2018).

[11]    Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, The New York Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited April 29, 2018).

[12]    *Id.*

[13]    *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared          statement          of          the          FTC),          *available          at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited April 29, 2018).

[14]    *Id.*

and then used that data, together with data from various other sources, to create psychographic profiles of people that could be used to influence voter opinion on behalf of politicians who hired them.[15]

35.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. GameStop is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### III.     Consumers Value Their Privacy and Consider Companies' Privacy Practices When Making Purchases

36.     As the data mining industry has grown, so too have consumer concerns regarding the privacy of personal information.

37.     Consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

---

[15]     Rosenberg, Matthew; Confessore, Nicholas; Cadwallader, Carole, *How Trump Consultants Exploited the Facebook Data of Millions*. The New York Times, March 17, 2018, *available at* https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html  (last visited April 29, 2018).

[16]     *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last visited April 29, 2018).

[17]     *Id.*

39.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[18] These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[19]

40.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20] As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

## IV.   GameStop Unlawfully Transmits, Disseminates, and/or Otherwise Discloses its Subscribers' Personal Reading Information

41.     GameStop maintains a vast digital database comprised of its subscribers' Personal Reading Information. Plaintiffs are informed and believe, and thereupon allege, that between May 29, 2015 and July 30, 2016, GameStop transmitted, disseminated, and/or otherwise disclosed its subscribers' Personal Reading Information to marketing companies and cooperatives, consumer-facing businesses, electronics companies and video-game publishers with whom it partners (including, on information and belief, Microsoft, Sony, and Nintendo), and other companies owned by GameStop, Corp. (the holding company of GameStop), as well as to data mining companies

---

[18]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited April 29, 2018).

[19]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited April 29, 2018).

[20]     See Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125 (last visited April 29, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

(including, on information and belief, Alteryx, Lorton Data, and Experian), who then supplemented that information with additional sensitive personal, lifestyle, and demographic information about each GameStop subscriber.

42.     Plaintiffs are informed and believe, and thereupon allege, that between May 29, 2015 and July 30, 2016, GameStop then further, transmitted, disseminated, and/or otherwise disclosed its mailing lists – which included subscribers' Personal Reading Information identifying them as purchasers of *Game Informer*, as well as other sensitive information obtained from data miners – to marketing companies and cooperatives, consumer-facing businesses, electronics companies and video-game publishers with whom it partners (including, on information and belief, Microsoft, Sony, and Nintendo), other companies owned by GameStop, Corp. (the holding company of GameStop), and the list goes on. *See id.*

43.     Plaintiffs are informed and believe, and thereupon allege, that as a result of GameStop's data compiling and sharing practices, companies can purchase mailing lists from GameStop that identify *Game Informer* subscribers and disclose other personal details of those subscribers. Disclosures of such highly-sensitive personal information put consumers at risk of serious harm from scammers.

44.     GameStop failed to seek its subscribers' prior written consent to the disclosure of their Personal Reading Information between May 29, 2015 and July 30, 2016, and subscribers remain unaware that their Personal Reading Information and other sensitive personal information has been bought and transmitted, disseminated, and/or otherwise disclosed on the open market.

45.     Consumers sign up for *Game Informer* subscriptions through numerous media outlets, including the Internet, telephone, traditional mail, and even in store at a GameStop location. Regardless of how the consumer subscribed, GameStop uniformly failed to obtain any form of consent from – or even provided effective notice to – its subscribers to authorize the disclosure of their Personal Reading Information between May 29, 2015 and July 30, 2016.

46.     Thus, Plaintiffs are informed and believe, and thereupon allege, that between May 29, 2015 and July 30, 2016, GameStop disclosed the Personal Reading Information of all of its

*Game Informer* subscribers – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to multiple third parties.

47.     By and through these actions, GameStop intentionally disclosed to third parties the Personal Reading Information of its Michigan subscribers, including of Plaintiffs and all other members of the Class, without the requisite consent, in direct violation of the VRPA.

## ALLEGATIONS RELATING TO PLAINTIFFS

48.     Each of the Plaintiffs is presently a citizen and resident of the State of Michigan. Plaintiffs Horton, Gibbs, and Myers each resided in Michigan at all times between May 29, 2015 and July 30, 2016, as well as other periods of time. Plaintiff Schoenrock resided in Michigan at all times between May 29, 2015 and in or about November 2015, among other periods of time.

49.     Each of the Plaintiffs purchased a subscription to *Game Informer* magazine from GameStop with money.

50.     Plaintiffs Schoenrock, Gibbs, and Myers maintained paid subscriptions to *Game Informer* magazine at all times between May 29, 2015 and July 30, 2016 (as well as at various times prior to May 29, 2015), and each of them received print copies of *Game Informer* magazine at a residential address in Michigan during either all or a substantial part of the period of time between May 29, 2015 and July 30, 2016, as well during various other periods of time prior to May 29, 2015.

51.     Plaintiff Horton maintained a paid subscription to *Game Informer* magazine at various times prior to May 29, 2015, and he received print versions of *Game Informer* magazine at his residential addresses in Michigan during such periods of time.

52.     None of the Plaintiffs ever agreed in writing or otherwise to allow GameStop to sell or disclose his Personal Reading Information to any unrelated third parties.

---

[21]     California's Reader Privacy Act Signed into Law, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited April 29, 2018).

53.     None of the Plaintiffs received notice of such disclosures before GameStop disclosed his Personal Reading Information to third parties.

54.     Plaintiffs are informed and believe, and thereupon allege, that at various times between May 29, 2015 and July 30, 2016, GameStop disclosed each of their Personal Reading Information (i.e., information that identifies them as having purchased a subscription to *Game Informer*), without obtaining any of their permission or notifying any of them in advance, to marketing companies and cooperatives, consumer-facing businesses, electronics companies and video-game publishers with whom it partners (including, on information and belief, Microsoft, Sony, and Nintendo), and other companies owned by GameStop, Corp. (the holding company of GameStop), as well as to data mining companies (including, on information and belief, Alteryx, Lorton Data, and Experian), who in turn appended the information with data from their own records.

55.     Plaintiffs are informed and believe, and thereupon allege, that at, during this same time period, GameStop also disclosed each of their Personal Reading Information to other third-party companies, including so-called "database cooperatives" without first obtaining any of their consent or notifying any of them in advance of the disclosures.

56.     GameStop's disclosures of Plaintiffs' Personal Reading Information between May 29, 2015 and July 30, 2016 constituted clear violations of the VRPA.

57.     Further, and even though it lacked permission to even disclose their Personal Reading Information in the first place, GameStop profited from its disclosures of Plaintiffs' Personal Reading Information.

58.     Because GameStop transmitted, disseminated, and/or otherwise disclosed and disclosed Plaintiffs' Personal Reading Information between May 29, 2015 and July 30, 2016, Plaintiffs now receive junk mail and telephone solicitations to their residences. These unwarranted offers waste Plaintiffs' time, money, and resources.  These harassing junk mail offerings and phone call solicitations are attributable to GameStop's unauthorized transmission, dissemination, and/or disclosure of Plaintiffs' Personal Reading Information, and they invaded Plaintiffs' privacy.

59.     Because Plaintiffs are entitled by law to privacy in their Personal Reading Information, and because they paid money for their subscriptions to *Game Informer*, GameStop's transmission, dissemination, and/or disclosure of their Personal Reading Information deprived Plaintiffs of the full set of benefits to which they were entitled as a part of their *Game Informer* subscriptions, thereby causing them economic harm. Accordingly, what Plaintiffs received (subscriptions without statutory privacy protections) was less valuable than what they paid for (subscriptions with accompanying statutory privacy protections), and they would not have been willing to pay as much, if at all, for their *Game Informer* subscriptions had they known that GameStop would disclose their Personal Reading Information.

## CLASS ACTION ALLEGATIONS

60.     Plaintiffs seeks to represent a class defined as all Michigan residents who, at any point in time between May 29, 2015 and July 30, 2016, had their Personal Reading Information disclosed to one or more third parties by GameStop without having provided GameStop prior written permission to make such disclosures (the "Class"). Excluded from the Class is any entity in which GameStop has a controlling interest, and officers or directors of GameStop.

61.     Members of the Class are so numerous that their individual joinder herein is impracticable. Plaintiffs are informed and believes, and thereupon allege, that members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but are readily determinable in GameStop's records through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of GameStop.

62.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether GameStop is "engaged in the business of selling at retail" books or other written materials (i.e., magazines); (b) whether GameStop obtained consent before disclosing to third parties Plaintiffs' and the Class's Personal Reading Information; (c) whether GameStop's disclosure of Plaintiffs' and the Class's Personal Reading Information

14

violated the Video Rental Privacy Act, VRPA § 2; and (d) whether GameStop's transmission, dissemination, and/or disclosure of Plaintiffs' and the Class's Personal reading Information constitutes unjust enrichment.

63.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class sustained damages as a result of GameStop's uniform wrongful conduct, based upon GameStop's disclosure of Plaintiffs' and the Class's Personal Reading Information.

64.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and they counsel.

65.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish GameStop's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of GameStop's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of the VRPA**
**(By Plaintiffs, on Behalf of Themselves and the Class,**
**Against GameStop, Inc. and Sunrise Publications, Inc.)**

66.     Plaintiffs repeat the allegations contained in paragraphs 1-65 as if fully set forth herein.

67.     Plaintiffs bring this claim on behalf of themselves and on behalf of members of the Class against GameStop (defined herein collectively as defendants GameStop, Inc. and Sunrise Publications, Inc.).

68.     Because GameStop publishes and sells subscriptions to *Game Informer* magazine to consumers, GameStop is engaged in the business of selling written materials at retail. *See* VRPA § 2.

69.     By purchasing subscriptions to *Game Informer*, Plaintiffs purchased written materials at retail from GameStop. *See* VRPA § 2.

70.     Because Plaintiffs purchased written materials at retail from GameStop, Plaintiffs are each a "customer" within the meaning of the VRPA. *See* VRPA § 1(a).

71.     Plaintiffs are informed and believe, and thereupon allege, that at various times between May 29, 2015 and July 30, 2016, GameStop disclosed to third parties the Personal Reading Information of each of the Plaintiffs, which identified each of them as a subscriber of *Game Informer*, in at least two ways.

72.     First, Plaintiffs are informed and believe, and thereupon allege, that GameStop disclosed, at various times between May 29, 2015 and July 30, 2016, customer mailing lists containing Plaintiffs' Personal Reading Information to various marketing companies and cooperatives, consumer-facing businesses, electronics companies and video-game publishers with whom it partners (including, on information and belief, Microsoft, Sony, and Nintendo), and other companies owned by GameStop, Corp. (the holding company of GameStop), as well as to data mining companies (including, on information and belief, Alteryx, Lorton Data, Experian, and/or

16

various others) who then supplemented those lists with additional sensitive personal, lifestyle, and demographic information from their own databases, before sending the lists back to GameStop.

73.     Second, Plaintiffs are informed and believe, and thereupon allege, that at various times between May 29, 2015 and July 30, 2016, GameStop transmitted, disseminated, and/or otherwise disclosed its customer mailing lists containing Plaintiff's Personal Reading Information – enhanced with additional personal, demographic and lifestyle information added by the data miners – to other third-party companies, which in turn transmitted, disseminated, and/or otherwise disclosed and/or disclosed those lists and that information to numerous other parties, including electronics companies and video-game publishers with whom GameStop partners (including, on information and belief, Microsoft, Sony, and Nintendo) and other companies owned by GameStop, Corp. (the holding company of GameStop).

74.     Plaintiffs are informed and believes, and thereupon allege, that at various times between May 29, 2015 and July 30, 2016, GameStop also disclosed customer mailing lists containing Plaintiffs' Personal Reading Information to other publishers, electronics companies, and video game publishers in return for lists of names, addresses and other contact information pertaining to "prospects", i.e., individuals who do not presently subscribe to *Game Informer* but who, based on certain personal demographic information, GameStop and its affiliates have deemed likely to subscribe if presented with the opportunity to do so via direct marketing by GameStop. Lists of "prospects" have significant value to publishers such as GameStop.

75.     By transmitting, disseminating, and/or otherwise disclosing or otherwise disclosing for value its subscriber lists between May 29, 2015 and July 30, 2016, as set forth above, GameStop disclosed to persons, other than Plaintiffs, records or information concerning Plaintiffs' purchases of written materials from GameStop. *See* VRPA § 2.

76.     The records or information GameStop disclosed to third parties between May 29, 2015 and July 30, 2016, as set forth above, indicate Plaintiffs' names and address(es), as well as the fact that they subscribed to *Game Informer*. Accordingly, the records or information disclosed

to third parties by GameStop between May 29, 2015 and July 30, 2016 indicated Plaintiffs' identities.  *See* VRPA § 2.

77.     None of the Plaintiffs nor any of the members of the Class provided GameStop consent, written or otherwise, to disclose their Personal Reading Information to a third party at between May 29, 2015 and July 30, 2016.

78.     Worse yet, none of the Plaintiffs nor any of the members of the Class received notice of GameStop's disclosures of their Personal Reading Information to third parties between May 29, 2015 and July 30, 2016.

79.     GameStop's disclosures of Plaintiffs' and the Class's Personal Reading Information between May 29, 2015 and July 30, 2016 were not made pursuant to a court order, search warrant, or grand jury subpoena.

80.     GameStop's disclosures of Plaintiffs' and the Class's Personal Reading Information between May 29, 2015 and July 30, 2016 were not made to collect payment for their subscriptions.

81.     Plaintiffs are informed and believe, and thereupon allege, that GameStop's disclosures of Plaintiffs' and the Class's Personal Reading Information between May 29, 2015 and July 30, 2016 were made to third parties in order to increase GameStop's revenue, and were therefore not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

82.     By disclosing Plaintiffs' and the Class's Personal Reading Information between May 29, 2015 and July 30, 2016, GameStop uniformly invaded Plaintiffs' and the Class's privacy in their reading habits. *See* VRPA § 2.

83.     Additionally, because Plaintiffs and the members of the Class paid for their subscriptions to *Game Informer*, and because GameStop was obligated to comply with the VRPA, GameStop's unlawful disclosure of Plaintiffs' and the other Class members' Personal Reading Information between May 29, 2015 and July 30, 2016 deprived Plaintiffs and the Class members of the full value of their paid-for subscriptions. Because Plaintiffs and the other Class members

ascribed monetary value to the privacy of their Personal Reading Information, GameStop's unlawful transmission, dissemination, and/or disclosure of their Personal Reading Information between May 29, 2015 and July 30, 2016 caused Plaintiffs and the Class members to receive less value than they paid for, thereby causing them economic harm.

84. Likewise, because Plaintiffs and the other Class members ascribed monetary value to the privacy of their Personal Reading Information, a subscription to *Game Informer* that keeps the subscriber's Personal Reading Information private is more valuable than one that does not.

85. Accordingly, had Plaintiffs been adequately informed of GameStop's disclosure practices in effect between May 29, 2015 and July 30, 2016, they would not have been willing to purchase their subscriptions to *Game Informer* at the price charged, if at all. Thus, GameStop's unlawful disclosures between May 29, 2015 and July 30, 2016 caused Plaintiffs economic harm.

86. GameStop's disclosure of Plaintiffs' Personal Reading Information to third parties between May 29, 2015 and July 30, 2016 also caused an influx of third party print advertisements to their homes and marketing calls to their telephones.

87. GameStop's disclosures of the Personal Reading Information of Plaintiffs and the members of the Class between May 29, 2015 and July 30, 2016 constituted clear violations of the VRPA and caused Plaintiffs and the members of the Class to suffer privacy-based and economic injuries. As a result of GameStop's unlawful disclosures between May 29, 2015 and July 30, 2016, Plaintiffs and the other Class members are each entitled to recover actual damages, including disgorgement, or $5,000.00, whichever is greater, as well as costs and reasonable attorneys' fees. VRPA § 5(a).

88. The right of Plaintiffs and all other members of the Class to bring a claim for statutory damages of $5,000.00 under the VRPA accrued, and thus vested, at the time GameStop committed its violations of the VRPA between May 29, 2015 and July 30, 2016 by disclosing Plaintiffs' and the other Class members' Personal Reading Information, as alleged herein.

89. Therefore, on behalf of themselves and the Class, Plaintiffs seek (1) actual damages, including disgorgement, or $5,000.00, whichever is greater, for each of themselves and

for each Class member pursuant to the VRPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to the VRPA § 5(b).

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**(By Plaintiffs, on Behalf of Themselves and the Class,**
**Against GameStop, Inc. and Sunrise Publications, Inc.)**

90.    Plaintiffs repeat the allegations contained in paragraphs 1-65 as if fully set forth herein.

91.    Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Class against GameStop (defined herein collectively as defendants GameStop, Inc. and Sunrise Publications, Inc.).

92.    Plaintiffs and the Class members conferred benefits on GameStop by providing GameStop with their Personal Reading Information and paying GameStop for their subscriptions. GameStop received and retained the information and money belonging to Plaintiffs and the Class when Plaintiffs and the Class subscribed to *Game Informer*.

93.    Because GameStop received and processed Plaintiffs' and the Class's subscription payments and Personal Reading Information, and because GameStop has employees handling customer accounts and billing as well as customer data, GameStop appreciates or has knowledge of such benefits.

94.    Under the VRPA, Plaintiffs and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

95.    Under principles of equity and good conscience, because GameStop failed to comply with the VRPA, GameStop should not be allowed to retain the full amount of money Plaintiffs and the Class paid for their subscriptions or the money it received by transmitting, disseminating, and/or otherwise disclosing Plaintiffs' and the Class's Personal Reading Information.

96.    Plaintiffs and the other Class members have suffered actual damages as a result of GameStop's unlawful conduct in the form of the value Plaintiffs and the other Class members paid

20

for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

97.     Additionally, Plaintiffs and the Class members have suffered actual damages inasmuch as GameStop's failure to inform them that it would disclose their Personal Reading Information caused them to purchase subscriptions when they otherwise would not have.

98.     Further, a portion of the purchase price of each GameStop subscription transmitted, disseminated, and/or otherwise disclosed to Plaintiffs and the other Class members was intended to ensure the confidentiality of Plaintiffs' and the other Class members' Personal Reading Information, as required by the VRPA. Because Plaintiffs and the other Class members were denied services that they paid for and were entitled to receive – i.e., confidentiality of their Personal Reading Information – and because Plaintiffs and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

99.     To prevent inequity, GameStop should return to Plaintiffs and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from GameStop's transmission, dissemination, and/or disclosure of Plaintiffs' and the Class's Personal Reading Information.

100.    Accordingly, Plaintiffs and the Class members seek an order declaring that GameStop's conduct constitutes unjust enrichment, and awarding Plaintiffs and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by GameStop through its transmission, dissemination, and/or disclosure of Plaintiffs' and the Class's Personal Reading Information.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Robert Jeremy Horton, Mark Schoenrock, Justin Gibbs, and Patrick Myers, on behalf of themselves and on behalf of all others similarly situated, pray that the Court enter judgment in their and the Class's favor and against Defendants GameStop, Inc. and Sunrise Publications, Inc.., and for the following relief:

A.      For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.      For an order declaring that GameStop's conduct as described herein violated the VRPA;

C.      For an order declaring that GameStop's conduct as described herein constituted unjust enrichment;

D.      For an award of actual damages, including disgorgement and restitution, or $5,000.00, whichever is greater, to each of the Plaintiffs and each Class member, as provided by the VRPA;

E.      For an order of restitution and all other forms of equitable monetary relief;

F.      For prejudgment interest on all amounts awarded; and

G.      For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  April 30, 2019                          Respectfully submitted,

                                                /s/ Philip L. Fraietta
                                                One of Plaintiff's Attorneys

                                                Frank S. Hedin
                                                fhedin@hedinhall.com
                                                David W. Hall*
                                                dhall@hedinhall.com
                                                HEDIN HALL LLP
                                                1395 Brickell Avenue, Suite 900
                                                Miami, Florida 33131
                                                Tel: 305.357.2107
                                                Fax: 305.200.8801

                                                Joseph I. Marchese
                                                jmarchese@bursor.com
                                                Philip L. Fraietta
                                                pfraietta@bursor.com
                                                BURSOR & FISHER, P.A.

888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Ian Lyngklip
ian@michiganconsumerlaw.com
LYNGKLIP & ASSOCIATES
CONSUMER LAW CENTER, PLC
24500 Northwestern Highway, Ste. 206
Southfield, Michigan  48075
Tel: (248) 208-8864

\* Application for Admission Forthcoming

*Counsel for Plaintiffs and the Putative Class*