| | |
|---|---|
| ROBERT JEREMY HORTON; MARK SCHOENROCK; JUSTIN GIBBS; and PATRICK MYERS, individually and on behalf of all others similarly situated, | Case No.: 1:18-CV-00596-GJQ-PJG |
| | [*Hon. Gordon J. Quist*] |
| Plaintiffs, | |
| v. | **Brief in Support of Defendants' Motion for Summary Judgment** |
| GAMESTOP, INC.; and SUNRISE PUBLICATIONS, INC., | |
| Defendants. | **[Oral Argument Requested]** |

**BRIEF IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Defendants GAMESTOP, INC. ("GameStop") and SUNRISE PUBLICATION, INC.

("Sunrise") (collectively, "Defendants") respectfully submit this Brief in Support of their Motion

for Summary Judgment ("Motion").

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    PROCEDURAL POSTURE .................................................................................. 1

III.   STATEMENT OF FACTS .................................................................................... 3

       A.     GameStop............................................................................................... 3

              1.     GameStop's Terms And Conditions And Privacy Policy............................ 4

              2.     GameStop's Relationship With Brierly + Partners, Inc............................. 6

              3.     GameStop's Relationship With Experian. .................................. 8

       B.     Sunrise Publications, Inc........................................................................ 10

              1.     Sunrise's Relationship With Lorton Data, Inc. ......................... 10

              2.     Sunrise's Relationship with Audit Bureau of Circulations...................... 11

       C.     Plaintiffs' Relationships with GameStop and Sunrise ......................... 12

              1.     Horton ................................................................................... 12

              2.     Gibbs and Myers ................................................................... 12

              3.     Schoenrock............................................................................ 12

IV.    SUMMARY JUDGMENT STANDARD ........................................................... 13

V.     ARGUMENT ....................................................................................................... 13

       A.     Defendants Did Not Violate Plaintiffs' Rights Under the VRPA........................ 13

              1.     Horton Has No Claim Under The VRPA. .............................. 15

              2.     Defendants Did Not Sell Magazines "At Retail" To Any Of The Plaintiffs. ........................................................................... 15

              3.     Any Disclosure Of Information That Occurred Between May 29, 2015 and July 30, 2016 Did Not Violate The VRPA Because The Disclosure Was With Defendants' Agents....................... 17

                     a.     Brierley ...................................................... 19

i

b.     Experian ......................................................................... 20

c.     Lorton Data .................................................................... 23

d.     ABC ................................................................................ 24

e.     Sunrise............................................................................ 24

4.     Gibbs, Myers, And Schoenrock All Consented To Defendants Disclosures Between May 29, 2015 and July 30, 2016................................................ 25

a.     Gibbs, Myers, And Schoenrock All Agreed To Be Bound By GameStop's Terms And Conditions. ........................................................ 26

b.     GameStop's PowerUp Rewards Terms And Conditions Incorporated By Reference GameStop's Privacy Policy. ......................... 27

c.     GameStop's Privacy Policy Expressly Allowed GameStop To Share Gibbs', Myers', And Schoenrock's Information. ........................... 28

B.     Plaintiffs' Unjust Enrichment Claim Fails As A Matter Of Law. ....................... 29

VI.     CONCLUSION ................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................13

*Boelter v. Hearst Commc'ns, Inc.*,
269 F. Supp. 3d 172 (S.D.N.Y. 2017)........................................................ *passim*

*Buell v. Orion State Bank*,
327 Mich. 43, 41 N.W.2d 472 (1950).................................................................29

*Cain v. Redbox Automated Retail, LLC*,
136 F. Supp. 3d 824 (E.D. Mich. 2015).......................................................25, 26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................................................13

*Coulter-Owens v. Time Inc.*,
695 F. App'x 117 (6th Cir. 2017) ................................................................ *passim*

*Coulter-Owens v. Time, Inc.*,
No. 12-CV-14390, 2016 WL 612690 (E.D. Mich. Feb. 16, 2016), aff'd, 695 F.
App'x 117 (6th Cir. 2017) .............................................................................16, 29

*Dow Corning Corp. v. Weather Shield Mfg., Inc.*,
790 F. Supp. 2d 604 (E.D. Mich. 2011)............................................................27

*Employers Ins. of Wausau v. Petroleum Specialties, Inc.*,
69 F.3d 98 (6th Cir. 1995) .................................................................................13

*Forge v. Smith*,
458 Mich. 198, 580 N.W.2d 876 (1998).............................................................27

*Gregg v. Allen-Bradley Co.*,
801 F.2d 859 (6th Cir.1986) ..............................................................................13

*Hergenreder v. Bickford Senior Living Grp., LLC*,
656 F.3d 411 (6th Cir. 2011) .............................................................................26

*Int'l Indus. Contracting Corp. v. Sofir Italia s.r.l.*,
No. 16-CV-13168, 2017 WL 3499899 (E.D. Mich. Aug. 16, 2017)....................26

*Karaus v. Bank of New York Mellon*,
831 N.W.2d 897 (Mich. Ct. App. 2012) .............................................................29

*Mitchell v. Toledo Hosp*.,
    964 F.2d 577 (6th Cir. 1992) ................................................13

*Mutchler v. Dunlap Mem'l Hosp.*,
    485 F.3d 854 (6th Cir. 2007) ................................................13

*Stephenson v. Golden*,
    279 Mich. 710 (1937) ................................................18

**Statutes**

Mich. Comp. Laws Ann. § Ch. 445 ................................................13

Mich. Comp. Laws Ann. § 445.1712 ................................................14, 15, 17

Mich. Comp. Laws Ann. § 445.1713(a) ................................................14, 25

Michigan's Video Rental Privacy Act ................................................ *passim*

**Rules**

Fed.R.Civ.P. 56(c) ................................................13

# I.     INTRODUCTION

Neither GameStop nor Sunrise violated Michigan's Video Rental Privacy Act ("VRPA"). The VRPA is not a blanket prohibition of the disclosure of all information to anyone by anyone. It prohibits a company that (1) sells magazines directly to customers from (2) disclosing to non-agent third parties, (3) without the customer's consent, that (4) the customer purchased the magazine.  Defendants did not directly sell any Plaintiff a magazine subscription.  GameStop sold each Plaintiff a PowerUp Rewards Pro membership, one of the perks of which was a *Game Informer* magazine subscription. And Sunrise did not sell anything directly to Plaintiffs.  Further, neither Defendant made any unauthorized disclosure of Plaintiffs' subscription status, as Plaintiffs allege. The few transmissions of Plaintiffs' information that may have occurred were made to Defendants' agents with the consent of Plaintiffs so that each Defendant could carry out its own business functions—like ensuring it mailed *Game Informer* magazine to correct mailing addresses or sending emails to its own customers.

This lawsuit is baseless. Despite months of aggressive discovery and the addition of several new plaintiffs, Plaintiffs have not been able to uncover any evidence of any wrongdoing on the part of Defendants. Therefore, Defendants respectfully request that the Court grant their Motion for Summary Judgment.

# II.     PROCEDURAL POSTURE

On May 29, 2018, Jeremy Horton ("Horton") filed, on behalf of himself and, purportedly, all others similarly situated, a complaint against GameStop. [ECF No. 1, PageID.1-20.] In that Complaint, Horton alleged that GameStop violated the VRPA by selling or otherwise disclosing, between May 29, 2015 and July 30, 2016, his personal reading information to "numerous third-party marketing, list-rental, and data mining companies." [*Id.* at PageID.1, ¶ 1.] Horton defined

"personal reading information" as "the full names of individuals who then subscribed or had previously subscribed to *Game Informer*," the "title of the publication subscribed to," and "home addresses," as "well as myriad other personal, lifestyle and demographic information." [*Id.* at PageID.1-2, ¶ 3.][1]

Horton specifically identified in his complaint "NextMark" as a "third-party compan[y]" to which GameStop disclosed his Personal Reading Information. [*Id.* at PageID.15, ¶ 69; *see also* ECF No. 1-2, PageID.23-26.] Defendants moved to dismiss the complaint, arguing, among other things, that Horton's allegations do "not plausibly state claims against" Defendants. [ECF No. 9, PageID.42-118.] Not only did Defendants not do what the Complaint alleged, but they also had never even heard of NextMark. The Court denied the motion, and the primary reason for doing so was Horton's representation, in Exhibit B to the Complaint, that "NextMark claims to sell the *Game Informer Magazine* mailing list." [ECF No. 18, PageID.157.]

Then, after (1) being told by Defendants that his Personal Reading Information was not disclosed between May 29, 2015 and July 30, 2016; (2) being provided records showing that he was not even a *Game Informer* subscriber between May 29, 2015 and July 30, 2016; and (3) subpoenaing NextMark for his Personal Reading Information and getting affirmative representations that neither NextMark nor its clients had any subscriber lists of GameStop or *Game Informer*, Horton still refused to dismiss his frivolous claims and instead amended his Complaint to add three additional named plaintiffs—Mark Schoenrock ("Schoenrock"), Justin Gibbs ("Gibbs"), and Patrick Myers ("Myers").

---

[1] For purposes of this Motion, the term "Personal Reading Information" means "name, title of magazine subscribed to, and address."

On April 30, 2019, Horton, Schoenrock, Gibbs, and Myers (collectively, "Plaintiffs") filed their first amended complaint, asserting the same basic allegations and the same two causes of action. [ECF No. 40, PageID.284-308.] Notably, Plaintiffs removed from the first amended complaint any reference to NextMark—which was the only factual allegation that allowed Horton to survive Defendants' original motion to dismiss. [*See* ECF No. 18, PageID.155-159.]

## III. STATEMENT OF FACTS

### A. GameStop

GameStop sells video games, video game consoles, and a myriad of other video game-related products. [Declaration of Elizabeth Sharp ("Sharp Decl."), ¶ 5.] It does this both online and at its brick-and-mortar stores, which are located throughout the United States. [*Id.*]

During the relevant time period, GameStop offered its customers the option to become a member of its loyalty program, called "PowerUp Rewards." [*Id.* at ¶ 6.] Between May 29, 2015 and July 30, 2016, there were two tiers of PowerUp Rewards membership. [*Id.* at ¶ 7.] The first tier, known as the "Player" tier (formerly known as the "Basic" tier), is free of charge. [*Id.*] The second tier, known as the "Pro" tier, requires the customer to pay an annual fee. [*Id.*] Pro members get more points than Player members for similar purchases and online activities, and they receive exclusive promotions and discounts. [*Id.* at ¶ 8.] Pro members can receive a one-year subscription to *Game Informer*, a video-game related magazine published by Sunrise, as one of the many perks of their Pro membership. [*Id.*] A Pro member can, however, cancel his or her *Game Informer* magazine subscription and still remain a PowerUp Rewards Pro Member. [Declaration of Cathleen Preston ("Preston Decl."), ¶ 5.] But cancelling the *Game Informer* subscription does not result in a refund of the annual fee. [*Id.*]

### 1. GameStop's Terms And Conditions And Privacy Policy

As early as November 18, 2013, GameStop had in each of its brick-and-mortar stores a PIN pad that was used when a customer purchased or renewed in store his or her PowerUp Rewards Pro membership. [Sharp Decl., ¶ 9.]

When purchasing or renewing in store a PowerUp Rewards Pro membership, the PIN pad would display various screens that required some action from the customer. [*Id.* at ¶ 10.] For example, the PIN pad would display the contact information of the customer and ask the customer to push one of two buttons: (1) "Yes, this is correct" or (2) "No, make changes." [*Id.* at ¶ 11; *see also* Exhibit A, attached to Sharp Decl.] The PIN pad would also ask the customer to either accept or decline the PowerUp Rewards Terms and Conditions. [Sharp Decl., ¶ 11; *see also* Exhibit B, attached to Sharp Decl.] Specifically, the PIN pad would display the following message:

> "As described in the PowerUp Rewards Terms and Conditions, I understand that I will receive program information and special offers by email."

[Sharp Decl., ¶ 11; Exhibit B, attached to Sharp Decl.]

Directly under the message were two buttons: (1) "I accept these conditions" or (2) "Decline." [Sharp Decl., ¶ 11; Exhibit B, attached to Sharp Decl.] In order to complete, in store, the PowerUp Rewards Pro membership purchase or renewal, every customer was required to accept the PowerUp Rewards Terms and Conditions. [Sharp Decl., ¶ 13.] GameStop made the PowerUp Rewards Terms and Conditions available to its brick-and-mortar stores, and the PowerUp Rewards Terms and Conditions were always available on GameStop's website. [*Id.*]

Aside from a few, minor changes, the PowerUp Rewards Terms and Conditions remained the same from 2010 to 2016. [*Id.* at ¶ 14.]  In 2013, the PowerUp Rewards Terms and Conditions expressly stated:

> "Privacy Policy: The information provided by the Member is subject to and will be handled according to the PowerUp Rewards Privacy Policy, available at PowerUpRewards.com."

[*Id.* at ¶ 15; *see also* Exhibit C, attached to Sharp Decl.]

As of July 1, 2013, GameStop's Privacy Policy applied to "information we collect about you from any source – through our Websites, in our retail stores, through our Power-Up Rewards Program, in any contest or promotion, or any other way." [Sharp Decl., ¶ 16; *see also* Exhibit D, attached to Sharp Decl.]  It further stated that "[b]y visiting a GameStop Website or retail store, participating in our PowerUp Rewards Program, or otherwise providing information to GameStop you are accepting the practices described in this Privacy Policy." [Sharp Decl., ¶ 17; *see also* Exhibit D, attached to Sharp Decl.]

The Privacy Policy then explained to whom GameStop shared the customer information it collects and the reason for that sharing. [Sharp Decl., ¶ 18.]  For example, with regard to sharing with third parties, the Privacy Policy stated:

> **Sharing with Third Parties.** We may share customer information that we collect with third parties. Usually, this information will be shared with a third party that has relationship with us as a business partner or marketing partner (see information on Third-Party Relationships below). Also, we may use the information that you provide us, or that we collect about you, in connection with the promotion of our products and services and those of our affiliates. It is not our policy to sell or rent lists of our Website customers to unaffiliated third parties.

[Sharp Decl., ¶ 19; *see also* Exhibit D, attached to Sharp Decl.]

And, with regard to GameStop's contractors, the Privacy Policy explained:

**Sharing with our Contractors.** We also may employ other companies and individuals to perform functions on our behalf. Examples include order fulfillment, package delivery, postal mail and email communications, customer lists management, data analysis, marketing services and assistance which may include content and ads presented on other websites or mobile applications, credit card processing, and customer relationship management. These companies and individuals have access to personal information needed to perform their functions, but they are not permitted to use such information for other purposes without our permission. A more detailed discussion of our relationship with certain third-party advertisers is set forth below under the heading "Third-Party Advertising".

[Sharp Decl., ¶ 20; *see also* Exhibit D, attached to Sharp Decl.]

## 2. GameStop's Relationship With Brierly + Partners, Inc.

Beginning in 2010, GameStop outsourced to Brierley + Partners, Inc. ("Brierley") certain aspects of the technical administration of GameStop's PowerUp Rewards program. [*See* Sharp Decl., ¶ 21; *see also* Brierley Master Services Agreement ("Brierley Contract"), attached as Exhibit E to Sharp Decl., p. 1.] Specifically, Brierley managed, hosted, and maintained GameStop's PowerUp Rewards database. [Sharp Decl., ¶ 21; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., Ex. B(2).] Thereafter, GameStop provided Brierley with PowerUp Rewards data files on a daily basis that reflected the transaction data for that day for any Rewards members ("Data Files"). [Sharp Decl., ¶ 22.] Although GameStop retains the underlying data contained in the Data Files, GameStop does not retain the Data Files sent to Brierley going back to May 29, 2015 through July 30, 2016. [*Id.*] The Data Files contained several different feeds that would notify Brierley if any PowerUp Rewards member (Player or Pro) updated his or her account information (*i.e.*, change in address, telephone number, email address, etc.), answered online questions relating to his or her preferences, received new points through something other than a purchase (e.g., online activity), made a transaction, or if GameStop updated or launched a new product. [*Id.*]

6

Brierley used these Data Files to update GameStop's PowerUp Rewards members' accounts, including determining the number of reward points accrued. [*Id.* at ¶ 23; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., Exhibit B, §1(A)(2).] Brierley would also, at the direction of GameStop, run queries on the PowerUp Rewards database to allow GameStop to send targeted marketing to individual PowerUp Rewards members. [Sharp Decl., ¶ 23; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., Exhibit B, §8(B)(1), §5.] That targeted marketing was always developed and sent at the direction of GameStop. [Sharp Decl., ¶ 23; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., Exhibit B, §5(A)(3).]

Under the Brierley Contract, all GameStop data provided to Brierley was and remained the property of GameStop. [Sharp Decl., ¶ 24; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., § 8.3.] Brierley was permitted to use GameStop's data "only in connection with its performance under [the Brierley Contract]…." [Sharp Decl., ¶ 24; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., § 8.1(a).] Brierley had no authority to transmit GameStop's data without GameStop's permission and, to GameStop's knowledge, never shared GameStop's data with any third party except as directed or permitted by GameStop. [Sharp Decl., ¶ 24; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., § 8.1(a).] At the termination of the Brierley Contract or at GameStop's request, Brierly was required to "return or destroy" GameStop's data, including "any information relating to [GameStop's] customers, including, but not limited to, name, address, shopping behavior or other personal information." [Sharp Decl., ¶ 24; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., § 8.1(c).]

### 3. GameStop's Relationship With Experian.

On July 28, 2014, GameStop entered into a contract with Experian ("Experian Contract"). [Sharp Decl., ¶ 25; *see also* Experian Contract, attached as Exhibit F to Sharp Decl.] Under that contract, Experian handled GameStop's email marketing campaigns, which had been previously handled by Brierley. [Sharp Decl., ¶ 26.] As with Brierley, every email sent by Experian on behalf of GameStop was at the direction of GameStop. [*Id.*]

To facilitate Experian's ability to send emails on GameStop's behalf, GameStop transferred its PowerUp Rewards data to Experian prior to May 29, 2015. [*Id.* at ¶ 27.] Thereafter, it provided Experian with Data Files on a daily basis. [*Id.*] Although GameStop did not retain the Data Files sent to Experian going back to May 29, 2015 through July 30, 2016, the content and format of the Data Files sent to Experian was similar, if not identical, to the content and format of the Data Files sent to Brierley. [*Id.*]

Pursuant to the Experian Contract, the information provided by GameStop to Experian remained, at all times, "the property of" GameStop. [*Id.* at ¶ 28; *see also* Experian Contract, attached as Exhibit F to Sharp Decl., § 5(a).] Furthermore, Experian could "only use [GameStop's] data as necessary to deliver the Services as provided for in [the Experian Contract] and any schedules…" [Sharp Decl., ¶ 28; *see also* Cross Channel Marketing Services Schedule ("Experian Schedule"), attached as Exhibit F to Sharp Decl., § 6.1.] Experian was also precluded from providing, "under any circumstances[,]…[GameStop] Data to any third parties except as expressly authorized by [GameStop] in writing." [Sharp Decl., ¶ 28; *see also* Experian Contract, attached as Exhibit F to Sharp Decl., § 5(a); Experian Schedule, attached as Exhibit F to Sharp Decl., § 6.1.] At GameStop's request or following the expiration of the term of the Experian Contract, Experian was required to return to GameStop or delete GameStop's data. [Sharp Decl.,

¶ 28; *see also* Experian Contract, attached as Exhibit F to Sharp Decl., § 5(a); Experian

Schedule, attached as Exhibit F to Sharp Decl., § 6.1.]

Any emails sent by Experian to PowerUp Rewards members were at the direction of

GameStop. [Sharp Decl., ¶ 27.] GameStop would define the "mailing segmentation," and

Experian would send the emails. [*Id.* at ¶ 29; *see also* Experian Contract, attached as Exhibit F to

Sharp Decl., Attachment 1, § 2(c).] GameStop "ha[d] and retain[ed] sole responsibility for the

content of its electronic messages, its data and transmission." [Sharp Decl., ¶ 29; *see also*

Experian Schedule, attached as Exhibit F to Sharp Decl., § 6.4.1(i).] Every email sent by

Experian on GameStop's behalf was required to "clearly identify [GameStop]… as 'Sender'"

and "[a]t no time shall Experian ever be considered the 'Sender' of [GameStop] electronic

messages." [Sharp Decl., ¶ 29; *see also* Experian Schedule, attached as Exhibit F to Sharp Decl.,

§ 6.4.1(iii).] GameStop also "authorize[d] Experian to independently create and maintain

outbound and inbound IP addresses on behalf of [GameStop]." [Sharp Decl., ¶ 29; *see also*

Experian Schedule, attached as Exhibit F to Sharp Decl., § 6.4.2(v).]

GameStop also entered into a contract with Experian on April 22, 2016.  [Sharp Decl.,

¶ 30; *see also* April 22, 2016 Experian Contract ("2016 Experian Contract"), attached as Exhibit

G to Sharp Decl.]  Under the April 2016 Experian Contract, GameStop directed Experian to

identify PowerUp Rewards members who were not customers of GameStop's newly acquired

company, ThinkGeek, so that GameStop could execute an email campaign to GameStop's

PowerUp Rewards members.  [Sharp Decl., ¶ 32.]  Also under the April 2016 Experian Contract,

Experian did not append any of its own data to ThinkGeek's or GameStop's data, nor was any

GameStop data shared with ThinkGeek. [*Id.* at ¶ 33.] In fact, the April 2016 Experian Contract

expressly stated that "[t]he Matched Output File does not contain any Experian data, and will

consist solely of [GameStop] Data." [*Id.*; *see also* Exhibit G, attached as Exhibit G to Sharp Decl., § 4.]

**B.    Sunrise Publications, Inc.**

Sunrise is a subsidiary of GameStop and publishes the *Game Informer* magazine. [Preston Decl., ¶ 3.] Each Plaintiff received a subscription to *Game Informer* magazine as a benefit of purchasing a PowerUp Rewards Pro membership. [Preston Decl., ¶ 21.]

**1.    Sunrise's Relationship With Lorton Data, Inc.**

Throughout the relevant time period, Sunrise utilized Lorton Data, Inc. ("Lorton Data") to ensure that Sunrise had the best possible addresses for its *Game Informer* subscribers. [Preston Decl., ¶¶ 7-8.] Prior to every mailing, Sunrise sent to Lorton Data a list of *Game Informer* subscribers who would be receiving the next edition. [*Id.* at ¶ 7.] Lorton Data would then, through its access to United States Postal Services information, verify the addresses provided, update the addresses if the particular subscriber had filed a "notice of change of address," or supplement the addresses with additional information (*i.e.,* apartment or suite numbers), if needed. [*Id.* at ¶ 8.]

Once this process was complete, Lorton Data would format the addresses in a manner readable by the printing machine (and not by any human) and forward the information to *Game Informer*'s printer. [*Id.* at ¶ 9.]

Per Lorton Data's General Terms and Conditions, Lorton Data could not use Sunrise data "on its own behalf or for its own interest without [Sunrise's] prior consent." [*Id.* at ¶ 10; *see also* Lorton Data General Terms and Conditions, attached as Exhibit N to Preston Decl., §8.] Sunrise never consented to Lorton Data using its data for anything other than the distribution of *Game Informer* magazine. [Preston Decl., ¶ 11.]

Sunrise does not retain the lists sent to Lorton going back to May 29, 2015 through July 30, 2016.  [*Id.* at ¶ 22.]

## 2. Sunrise's Relationship with Audit Bureau of Circulations

In December 1995, Sunrise applied for publisher membership in the Audit Bureau of Circulations ("ABC").  [Preston Decl., ¶ 12.]  ABC allows publishers to, among other things, obtain independently verified subscription totals.  [*Id.*]

In December 2015, Sunrise sent to ABC a list of every person who was subscribed to *Game Informer* magazine in April 2015. [*Id.* at ¶ 13.]  Sunrise sent the list of April 2015 subscribers to ABC so that ABC could independently verify the total number of *Game Informer* subscribers who were subscribed to *Game Informer* in April 2015. [*Id.* at ¶14.]  Because Myers was the only Plaintiff who was subscribed to *Game Informer* magazine in April 2015, he was the only named Plaintiff whose information was provided to ABC in December 2015. [*Id.* at ¶ 23.]

ABC's verification process is a necessary part of Sunrise's business. [*Id.* at ¶ 15.]  It allows Sunrise to provide potential advertisers with a third-party-verified total number of *Game Informer* subscribers. [*Id.*]  The total number of *Game Informer* subscribers impacts the cost of advertising in *Game Informer* magazine. [*Id.*]

Sunrise's transfer of data to ABC in December 2015 was governed by ABC's 2015 Bylaws & Rules Book, Edition BP2 – U.S. ("2015 ABC Rules").  [*Id.* at ¶ 16; *see also* 2015 ABC Rules, attached as Exhibit O to Preston Decl.]  The 2015 ABC Rules stated: "All such information so obtained, together with transcripts of any such books and records, work sheets, memoranda, communications to AAM and its subsidiaries, and other information in the possession of AAM and its subsidiaries pertaining to an AAM report, shall be confidential and used solely for the above purposes, and shall not be available or used for any other purpose

except by authority of the board of directors." [Preston Decl., ¶ 16; 2015 ABC Rules, attached as Exhibit O to Preston Decl., § 2.12.]

### C.    Plaintiffs' Relationships with GameStop and Sunrise

#### 1.    Horton

Horton was neither a PowerUp Rewards Pro member nor a *Game Informer* subscriber between May 29, 2015 and July 30, 2016. [Sharp Decl., ¶¶ 38-40; *see also* Exhibit H, attached to Sharp Declaration; Preston Decl., ¶ 21.] Similarly, Horton did not purchase anything from Defendants between May 29, 2015 and July 30, 2016. [Sharp Decl., ¶ 40.]

#### 2.    Gibbs and Myers

Gibbs and Myers were both PowerUp Rewards Pro members at some point between May 29, 2015 and July 30, 2016. [Sharp Decl., ¶¶ 41, 43.] Myers renewed his PowerUp Rewards Pro one-year membership in store on October 21, 2014 and again on March 29, 2016. [Sharp Decl., ¶ 43; *see also* Exhibits K, L, attached to Sharp Decl.] As a perk of those renewals, Myers received a one-year print subscription to *Game Informer* magazine. [Sharp Decl., ¶ 44.]

Gibbs renewed in store his PowerUp Rewards Pro one-year membership on May 1, 2014 and again on July 25, 2015. [Sharp Decl., ¶ 41; *see also* Exhibits I, J, attached to Sharp Dec.] With those renewals, Gibbs received a one-year print subscription to *Game Informer* magazine. [Sharp Decl., ¶ 42.]

#### 3.    Schoenrock

Schoenrock renewed, in store, his PowerUp Rewards Pro membership on January 18, 2016 and remained a PowerUp Rewards Pro member through the end of the relevant time period, July 30, 2016. [*Id.* at ¶ 45; *see also* Exhibit M, attached to Sharp Decl.]  He was not a PowerUp Rewards Pro member from May 31, 2015 to January 17, 2016.  [Sharp Decl., ¶ 45.]  Unlike

Gibbs and Myers, however, Schoenrock did not receive a print subscription to *Game Informer* magazine, opting instead to receive a digital copy. [*Id.;* Exhibit M, attached to Sharp Decl.]

## IV. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007) (quoting Fed.R.Civ.P. 56(c)). "The moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only 'show [ ]'—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The "pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Id.* The plaintiff must present "more than a mere scintilla of evidence in support of his position; the plaintiff must present 'evidence on which the jury could reasonably find for the plaintiff.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)).

## V. <u>ARGUMENT</u>

### A. <u>Defendants Did Not Violate Plaintiffs' Rights Under the VRPA.</u>

In 1989, the Michigan legislature enacted a statute "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials; and to provide penalties and remedies for violation of this act." Mich. Comp. Laws Ann. § Ch. 445, Refs & Annos. Known as

the VRPA, the statute prohibited "a person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings [from] disclos[ing] to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer." Mich. Comp. Laws Ann. § 445.1712.

Although Plaintiffs would like this Court to read the VRPA as if it broadly prohibits the sharing of all information by anyone to anyone, its application is actually much narrower. First, the VRPA does not apply to every entity that sells magazines; it only applies to those that sell magazines "at retail." *Coulter-Owens v. Time Inc.*, 695 F. App'x 117, 124 (6th Cir. 2017). Second, the VRPA does not prohibit the sharing of information with everyone; it only prohibits the sharing of information with non-agents. *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 191 (S.D.N.Y. 2017). And, finally, the VRPA expressly allows the sharing of information when the individual about whom the information relates has provided "written permission" to do so. Mich. Comp. Laws Ann. § 445.1713(a).

Here, nothing either GameStop or Sunrise did between May 29, 2015 and July 30, 2016 violated the VRPA. Defendants did not sell *Game Informer* magazine "at retail;" GameStop sold Plaintiffs PowerUp Rewards Pro memberships. Moreover, to the extent Defendants did transmit any information about Plaintiffs to other entities during the relevant time period, those entities were Defendants' agents carrying out Defendants' business functions. And, finally, should this Court need to reach this point, Plaintiffs expressly consented to the exact sharing they complain of. Therefore, Defendants did not violate the VRPA between May 29, 2015 and July 30, 2016, and Defendants' motion should be granted.

### 1. Horton Has No Claim Under The VRPA.

As an initial matter, Horton has no claim under the VRPA against either Defendant. The only entities with whom Defendants potentially transmitted Personal Reading Information between May 29, 2015 and July 30, 2016 were (1) Experian, (2) Brierley, (3) Lorton Data, and (4) ABC. But, between May 29, 2015 and July 30, 2016, the only time GameStop provided Experian or Brierley any information regarding PowerUp Rewards Pro membership purchases was on the date the customer made the purchase. [Sharp Decl., ¶¶ 22, 27.] And the only time prior to July 30, 2016 that Horton signed up to receive the membership was on May 22, 2010—more than five years before the statute of limitations. [*Id* at ¶ 38; *see also* Exhibit H, attached to Sharp Decl.] As for Lorton Data, Sunrise only provided it the information of subscribers who would be receiving the next *Game Informer* print edition. [Preston Decl., ¶ 7.] Horton did not receive a *Game Informer* print magazine between May 29, 2015 and July 30, 2016. [Sharp Decl., ¶¶ 38-40.] And, with regard to ABC, the only information provided to ABC was information related to individuals who subscribed to *Game Informer* magazine in April 2015, which Horton did not do. [Preston Decl., ¶ 13.] Therefore, regardless of any other arguments Defendants may have, Horton does not have an actionable claim under the VRPA. His Personal Reading Information simply was not disclosed by Defendants to anyone during the relevant time period. His VRPA claim must be dismissed.

### 2. Defendants Did Not Sell Magazines "At Retail" To Any Of The Plaintiffs.

The VRPA only regulates entities "engaged in the business of selling ***at retail***, renting, or lending books or other written materials…" Mich. Comp. Laws Ann. § 445.1712 (emphasis added). Here, because all of the Plaintiffs voluntarily received their *Game Informer* subscription as a benefit of their GameStop PowerUp Rewards Pro membership purchase, neither GameStop

nor Sunrise sold any Plaintiff a *Game Informer* subscription "at retail," as expressly required under the VRPA.

In *Coulter-Owens*, 695 F. App'x 117, the Sixth Circuit interpreted "at retail" and specifically held that not every transaction involving magazine subscriptions is subject to the VRPA. There, the plaintiff sued Time for allegedly disclosing to third parties that she subscribed to various magazines. *Id.* at 119. The plaintiff, however, had not purchased any magazines directly from Time. Instead, she purchased them through a third-party reseller website, Magazine.com. *Coulter-Owens v. Time, Inc.,* No. 12-CV-14390, 2016 WL 612690, at *1 (E.D. Mich. Feb. 16, 2016), aff'd, 695 F. App'x 117 (6th Cir. 2017). In upholding summary judgment on the VRPA claim for lack of an "at retail" transaction between the plaintiff and Time, the Sixth Circuit narrowly construed the VRPA and held:

> But the real question (the purely legal question) is whether the sale was "at retail," …. One might find it odd to think that the Michigan legislature intended to penalize the disclosure of this information by the subscription agents but not by the publisher (Time), even though (1) the subscription agent would have to disclose this information to Time to fulfill the order and (2) the [VR]PA would prevent the disclosure by Time if Time sold the same subscription directly from its own website. It is perhaps likely that the legislature intended to regulate any company that sells to the public (as Time does). But because the statute specifically includes the phrase "at retail," it necessarily excludes nonretail sales (and nonretail sellers). Some types of sale, and sellers, are nonretail and it is not unreasonable to conclude that the intermediary subscription agent as used in this case renders Time a nonretail seller.

*Coulter-Owens v. Time Inc.,* 695 F. App'x 117, 123 (6th Cir. 2017).

Here, Plaintiffs' receipt of their *Game Informer* subscription as a perk of being a PowerUp Rewards Pro member is yet another example of a "nonretail" transaction that is not subject to the VRPA. Neither GameStop nor Sunrise sold any Plaintiff a *Game Informer*

subscription. Sunrise did not sell anything to any Plaintiff. And GameStop sold Plaintiffs PowerUp Rewards Pro memberships. [Sharp Decl., ¶¶ 38-46; *see also* Exhibits H-M, attached to Sharp Decl.] While Plaintiffs had the option of receiving a *Game Informer* subscription with their PowerUp Rewards Pro membership, it was just one of many perks that came with the membership. [Sharp Decl., ¶ 8.] For example, with the purchase of a PowerUp Rewards Pro membership, Plaintiffs received: (1) exclusive promotional offers; (2) the ability to receive more reward points than non-Pro members for similar purchases; and (3) greater discounts on products. [*Id*.] Customers were free to cancel the subscription, yet still be PowerUp Rewards Pro members. [Preston Decl., ¶ 5.] But regardless of whether the customer received the magazine, they still paid the same amount for the PowerUp Rewards Pro membership. [*Id*.] Thus, GameStop was not "engaged in the business of selling at retail" magazines, and, therefore, these transactions, like those in *Coulter-Owens*, are not regulated by the VRPA.

3. **Any Disclosure Of Information That Occurred Between May 29, 2015 and July 30, 2016 Did Not Violate The VRPA Because The Disclosure Was With Defendants' Agents.**

The VRPA "prohibits 'a person, or an employee or agent of the person' from disclosing a customer's personal information…." *Boelter*, 269 F. Supp. 3d at 191 (quoting Mich. Comp. Laws Ann. § 445.1712 (Sec. 2)(1)). At least one court has stated that "the prohibition against disclosure by an employee or agent would be unnecessary if the disclosure *to* an employee or agent would itself be actionable." *Id.* (emphasis added). Therefore, the VRPA contains an exception for disclosures made to agents or employees. *Id.* at 195.

The only case that analyzes the VRPA's "agent" exception is *Boelter*. There, the plaintiff sued Hearst Communications, Inc. ("Hearst"), the publisher of multiple magazines, alleging that Hearst violated the VRPA by disclosing to six different companies that she was a magazine subscriber. *Id.* at 178. Hearst then moved for summary judgment. *Id.* at 187. Hearst argued,

17

among other things, that its disclosures were permitted under the VRPA because each of the companies were Hearst's agents. *Id.*

Before analyzing whether the companies were, in fact, Hearst's agents, the court first determined what constitutes an "agent" under the VRPA. Noting that the VRPA "does not define the term" "agents," the court looked to "dictionaries of the same vintage as the VRPA" and found that "agent" is "defined as, *inter alia*, 'a person, firm, etc. empowered to act for another.'" *Id.* at 193-194. This definition, the court noted, was consistent with "general agency principles, [Citation], and the fact that most employers are corporate entities that cannot function without delegating supervisory power." *Id.* at 194 (internal quotations omitted).

The Court then turned to the individual companies. As the Court stated, "[i]n determining whether a third party is an agent, a court considers the contract between the parties as one factor." *Id.* But "the actions of the parties also are relevant." *Id.* "An agent is a person having express or implied authority to represent or act on behalf of another person, who is called his principal. ... Whether an agency has been created is to be determined by the relations of the parties as they in fact exist under their agreements or *acts*." *Id.* (quoting *Stephenson v. Golden*, 279 Mich. 710, 734 (1937)) (emphasis in original). Therefore, "one may be both an independent contractor and an agent." *Id.* (internal quotations omitted).

The Court decided the agency question for three of the entities. It found that Acxiom, which was the "functional equivalent of [Hearst's] IT department," *Id.* at 200, was an agent, but that Experian and "Company 3" were not. *Id.* at 207. Comparing the services Acxiom provided Hearst to the services Brierley, Experian, Lorton, and ABC provided Defendants here makes clear that Brierley and Experian were GameStop's agents and that Lorton and ABC were Sunrise's agents.

In *Boelter*, Acxiom "hosted and maintained" Hearst's marketing database. *Id.* at 180. Hearst "owned or licensed all the data residing in the database" and paid "Acxiom monthly fees to host, maintain, and operate the database and perform related services." *Id.* Acxiom "receive[d] and input[ted] information from [Hearst], processe[d] and organize[d] that data, provide[d] analytical tools to access and use the information, and execute[d] [Hearst's] instructions with respect to certain external transmissions." *Id.* at 200. Acxiom, however, "ha[d] no authority to transmit [Hearst's] data without [Hearst's] permission and [could] not use the data for its own purposes." *Id.* at 180. Acxiom "never shared [Hearst's] subscriber data with any third party except as directed or permitted by [Hearst]." *Id.* at 200. Finally, "[p]ursuant to the contract between [Hearst] and Acxiom, Acxiom would perform all services as an 'independent contractor, and nothing contained [in the contract] shall be deemed to create any employment, associate, partnership, joint venture, or relationship of principal and agent or master and servant' between the two parties." *Id.* at 180.

Despite this last contractual provision, the Court found that "[g]iven the scope of this relationship, it is ***clear*** that Acxiom was [Hearst's] agent." *Id.* at 200 (emphasis added). More specifically, the Court found that "it would be an absurd result if the statute prohibited a company from utilizing outside vendors to perform key tasks—such as IT, subscription management, shipping and fulfillment, legal, and so on—who might need to know a customer's subscription purchase information." *Id.* at 201. The same is true here with regard to Brierley, Experian, Lorton Data, and ABC.

### a. Brierley

Like Acxiom in *Boelter*, Brierley managed, hosted, and maintained GameStop's PowerUp Rewards database. [Sharp Decl., ¶ 21; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., Ex. B(2) ("Brierley+Partners will provide GameStop with a comprehensive

database system to store and manage GameStop's customer and customer transactional information…").] Like Acxiom, Brierley did not own or license the PowerUp Rewards data; at all times, GameStop owned it. [Sharp Decl., ¶ 24; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., § 8.3 (GameStop "shall retain ownership of all data provided to Brierley or created by Brierley for [GameStop]….").] Like Acxiom, Brierley "receive[d] and input[ted] information from [GameStop], processe[d] and organize[d] that data, provide[d] analytical tools to access and use the information, and execute[d] [GameStop's] instructions with respect to certain external transmissions." [Sharp Decl., ¶ 24; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., Ex. B(3).] Like Acxiom, Brierley "ha[d] no authority to transmit [GameStop's] data without [GameStop's] permission," could "not use the data for its own purposes," and "never shared [GameStop's PowerUp Rewards] data with any third party except as directed or permitted by [GameStop]." [Sharp Decl., ¶ 24; *see also* Brierley Contract, attached as Exhibit E to Sharp Decl., § 8.1(a).] And just as with Acxiom, the contract between Brierley and GameStop stated that Brierley was acting as an "independent contractor." [Brierley Contract, attached as Exhibit E to Sharp Decl., §15.2.] Therefore, Brierley was GameStop's agent, rendering any disclosures of Personal Reading Information made to Brierley during the relevant time period outside the scope of the VRPA.

### b. Experian

The services Experian provided GameStop here are also similar to the services performed by Acxiom in *Boelter*. They are not like the services that Experian provided Hearst in *Boelter*. The fact that Experian was not an agent in *Boelter* is not dispositive here because Experian is a company that performs many services to many different companies under many different circumstances. Here, just as Acxiom was the "functional equivalent of [Hearst's] IT department," Experian was the functional equivalent of GameStop's IT email marketing

department. GameStop transferred its PowerUp Rewards data to Experian, prior to the relevant time period, so that GameStop could instruct Experian to which of its PowerUp Rewards members to send GameStop emails. [Sharp Decl., ¶¶ 26-27.] Experian never owned or licensed the PowerUp Rewards data. [*Id.* at ¶ 28; Experian Contract, attached as Exhibit F to Sharp Decl., § 5(a).] Just as with Brierley, ownership always remained with GameStop. [Sharp Decl., ¶ 28; Experian Contract, attached as Exhibit F to Sharp Decl., § 5(a) (GameStop "data…will be and will remain the property of [GameStop]").] Absent express instructions from GameStop, Experian could not and did not transfer the PowerUp Rewards data to any other entity. [Sharp Decl., ¶ 28; Experian Contract, attached as Exhibit F to Sharp Decl., § 5(a) (Experian "shall not under any circumstances provide [GameStop] data to any third parties except as expressly authorized by [GameStop] in writing").] Additionally, Experian could not use the PowerUp Rewards data for its own purposes. [Experian Contract, attached as Exhibit F to Sharp Decl., § 5(a) ("Experian shall only use [GameStop] data as necessary to deliver the services as provided for in this Agreement and any Schedules…").] Nor could Experian send any communications to PowerUp Rewards members absent express permission from GameStop. [Sharp Decl., ¶ 29; Experian Contract, attached as Exhibit F to Sharp Decl., p. 6, § 6.1.]

In essence, GameStop would decide to send a GameStop marketing email to a certain portion of PowerUp Rewards members (*i.e.*, individuals who had purchased a certain video game in the last year). [Sharp Decl., ¶ 29.] GameStop would compose the email and provide it to Experian. [*Id.*; *see also* Experian Schedule, attached as Exhibit F to Sharp Decl., p. 6, § 6.4.1(i) (stating that GameStop is solely responsible for content of electronic messages).] GameStop would then instruct Experian to whom the email should be sent. [Sharp Decl., ¶ 29; Experian Contract, attached as Exhibit F to Sharp Decl., Attachment 1, § 2(c) (stating that GameStop

defines to whom the mail should be sent).].] Experian would query the PowerUp Rewards database, find the appropriate recipients, and distribute the email for GameStop. [Sharp Decl., ¶ 49; Experian Contract, attached as Exhibit F to Sharp Decl., Attachment 1, § 2(c).]

GameStop entered into one additional contract with Experian on April 22, 2016. [Sharp Decl., ¶ 30; *see also* April 2016 Experian Contract, attached as Exhibit F to Sharp Decl.] Under that April 2016 Experian Contract, GameStop directed Experian to identify PowerUp Rewards members who were not customers of GameStop's newly acquired company, ThinkGeek, so that GameStop could execute an email campaign to its PowerUp Rewards members. [Sharp Decl., ¶¶ 31-32; April 2016 Experian Contract, attached as Exhibit G to Sharp Decl.] The April 2016 Experian Contract, however, also clearly states that Experian did not append any of its own data to ThinkGeek's or GameStop's data. [Sharp Decl., ¶ 33; April 2016 Experian Contract, attached as Exhibit G to Sharp Decl., §4 ("The Matched Output File does not contain any Experian data, and will consist solely of [GameStop] Data.").] And GameStop did not share any data with ThinkGeek at all. [Sharp Decl., ¶33.]

Ultimately, like Hearst did with Acxiom, GameStop "utiliz[ed] [an] outside vendor[]," Experian, "to perform [a] key task[]," *i.e.,* querying GameStop's PowerUp Rewards database to determine which members met GameStop's specified criteria and sending to those members the email GameStop drafted. [Sharp Decl., ¶¶ 25-33.] And, just as in *Boelter*, "it would be an absurd result if the [VRPA] prohibited a company from" doing exactly that. *Boelter*, 269 F. Supp. 3d at 201.

As noted above, the relationship between Experian and GameStop here is different than the relationship between Experian and Hearst in *Boelter* for multiple reasons. First, unlike here, where GameStop utilized Experian's services on a continual basis to outsource its email

22

marketing department, in *Boelter,* Hearst contracted with Experian to, on an annual basis, "'overlay' additional data about [approximately 14 to 20 million records of current and former subscribers], such as political affiliation or demographic information." *Boelter*, 269 F. Supp. 3d at 180. Second, in *Boelter*, "Experian was afforded the right to employ such methods and procedures in the performance of [the agreement] as Experian shall deem appropriate[.]" *Id.* at 201–02 (alteration in original). Here, under the Experian Contracts, GameStop was required to provide "Experian with such information as necessary to provide the services, which shall include…specifications or criteria reasonably necessary to perform the services[.]" [Experian Contract, attached as Exhibit F to Sharp Decl., § 3.] Third, in *Boelter,* Experian "dictated the format of the data Defendant delivered to it," *Boelter*, 269 F. Supp. 3d at 202, whereas, here, GameStop and Experian worked together to create a "[c]ustom account set up including [a] Client specific database…." [Experian Contract, attached as Exhibit F to Sharp Decl., Attachment 1, § 1.] Put simply, the facts in *Boelter* that led the court to conclude that Experian was not Hearst's agent are not present here.

### c. Lorton Data

As noted above, Sunrise did not sell *Game Informer* to any Plaintiff at all, let alone "at retail," so it is not subject to the VRPA here. However, even if it was, the result would be no different with regard to Sunrise's disclosures to Lorton Data. Sunrise utilized Lorton Data's services to ensure that *Game Informer* magazines were being sent to the proper address. [Preston Decl., ¶¶ 7-8.] And, just as with Experian and Brierley, Lorton Data could not use the information that Sunrise sent it "on its own behalf or for its own interest without [Sunrise's] prior consent." [*Id.* at ¶ 10; *see also* Lorton Data General Terms and Conditions, attached as Exhibit N to Preston Decl., §8.] Sunrise never consented to Lorton Data using its data for anything other than the distribution of *Game Informer* magazine. [Preston Decl., ¶ 11.] Indeed, Sunrise used

Lorton Data for one of the services that the court in *Boelter* said it would be "absurd" for the VRPA to prevent—namely, "shipping and fulfillment." *Boelter,* 269 F. Supp. 3d at 191.

### d.  ABC

With regard to ABC, it was merely auditing Sunrise's subscription list. [Preston Decl., ¶ 14.]  It was not using the list for its own purpose; in fact, its own rules prevented it from doing so.  [*Id.* at ¶ a6; *see also* 2015 ABC Rules, attached as Exhibit O to Preston Decl., § 2.12.] In order to sell advertising in *Game Informer* magazine, Sunrise needed an independent third party to verify the size of the *Game Informer* subscriber list.  [Preston Decl., ¶ 15.] ABC was that independent third party acting as Sunrise's agent; nothing more.  [*Id.* at ¶¶ 12-16.] To hold otherwise would be, as the Court in *Boelter* stated, an "absurd result." *Boelter,* 269 F. Supp. 3d at 191.

### e.  Sunrise

Finally, in their complaint, Plaintiffs appear to be alleging that Defendants violated the VRPA by disclosing their Personal Reading Information to unidentified "other companies owned by GameStop, Corp. (the holding company of GameStop)…."  [ECF No. 40, PageID.243, ¶ 41.] They allege no facts in support of this conclusory allegation. But, if Plaintiffs are alleging that GameStop violated the VRPA by disclosing their Personal Reading Information to Sunrise so that Plaintiffs could receive their *Game Informer* magazine from the publisher, Plaintiffs are wrong.

Plaintiffs purchased from GameStop PowerUp Rewards Pro memberships and, as a benefit of that membership, they each received a one-year subscription of *Game Informer* magazine.  [Sharp Decl., ¶¶ 8, 38-46.]  GameStop does not publish *Game Informer* magazine; Sunrise does. [Preston Decl., ¶ 3.]  Therefore, without providing Sunrise Plaintiffs' Personal Reading Information, Plaintiffs would not have been able to receive *Game Informer* magazine at

all. [*Id.* at ¶ 21.] To prevent GameStop from providing Sunrise with Plaintiffs' Personal Reading Information would be the "absurd result" discussed by the court in *Boelter*. *Boelter*, 269 F. Supp. 3d at 201.

Given that Brierley, Experian, Lorton Data, and ABC were all agents of Defendants, any information sharing that occurred with them is not actionable under the VRPA. As such, the Court should enter judgment in favor of Defendants on Plaintiffs' VRPA claim.

### 4. Gibbs, Myers, And Schoenrock All Consented To Defendants Disclosures Between May 29, 2015 and July 30, 2016.

The VRPA expressly allows the sharing of a person's Personal Reading Information when the person has provided "written permission." Mich. Comp. Laws Ann. § 445.1713(a). Written permission can come in many forms. It can be obtained through a written form, or, as in *Cain v. Redbox Automated Retail, LLC,* 136 F. Supp. 3d 824, 837 (E.D. Mich. 2015), it can be obtained through an electronic device, like a PIN pad.

In *Cain*, the court found that the plaintiffs had consented to Red Box's sharing of their information when they selected the "check-out" button on the touchscreen located on the Red Box kiosk. *Id.* The "check-out" screen stated: "By clicking on 'Check Out' you agree to the following terms and conditions." *Id.* at 826. Red Box's terms and conditions, or "Terms of Use," "refer[red] on several occasions to the applicable Privacy Policy, which describe[d] the ways in which the customer authorizes Redbox to use certain 'personal information' and other data collected by Redbox during the transaction." *Id.* at 827. Red Box's Privacy Policy stated:

> "Redbox may use information collected through the Redbox Platforms, including your Personal Information, to: (1) allow you to participate in features we offer or to provide related customer service, including, without limitation, to respond to your questions, complaints or comments; (2) tailor content recommendations and offers we display to you; (3) process a rental or other transaction you initiate; (4) provide you with information, products or services that you have requested or that we think may interest you; (5) process your registration, including verifying your

25

e-mail address is active and valid; (6) improve the Redbox Platforms or our
services and for internal business purposes;...."

*Id.* at 835.

To determine whether the plaintiffs had, in fact, consented to Red Box' sharing of their
information, the court had to analyze three questions. First, were the plaintiffs bound by Red
Box's Terms of Use? *Id.* at 831. Second, if they were, did the Terms of Use incorporate by
reference Red Box's Privacy Policy? *Id.* at 833. And third, if the Privacy Policy was incorporated
by reference, did Red Box share the plaintiffs' information in a manner consistent with the
Privacy Policy? *Id.* at 835. The Court answered each of these questions in the affirmative, and its
analysis compels the same result here.

> **a.** **Gibbs, Myers, And Schoenrock All Agreed To Be Bound By
> GameStop's Terms And Conditions.**

There can be no dispute that GameStop formed a binding and valid contract with Gibbs,
Myers, and Schoenrock when they renewed their PowerUp Rewards Pro memberships. The
parties were competent, the transaction was legal, and both parties were required to provide
consideration—payment from Gibbs, Myers, and Schoenrock, and membership in the PowerUp
Rewards Pro program from GameStop. *Int'l Indus. Contracting Corp. v. Sofir Italia s.r.l.*, No.
16-CV-13168, 2017 WL 3499899, at *3 (E.D. Mich. Aug. 16, 2017) (quoting *Hergenreder v.
Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011) (stating that under
Michigan law, elements of a valid contract are: "(1) parties competent to contract, (2) a proper
subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of
obligation.'")).

Nor can there be any dispute that the PowerUp Rewards Terms and Conditions were a
part of that contract. First, the PowerUp Rewards Terms and Conditions made clear that
"[m]embers of the Program ("Members") agree to the terms and conditions ("T&C") published

and subject to periodic update at www.PowerUpRewards.com." [Sharp Decl., ¶ 15; *see also* Exhibit C, attached to Sharp Decl.] Second, Gibbs, Myers, and Schoenrock expressly agreed to the PowerUp Rewards Terms and Conditions. As discussed above, when Gibbs, Myers, and Schoenrock completed their in-store renewal of their PowerUp Rewards Pro membership, they (1) were put on notice that the PowerUp Rewards program was governed by the "PowerUp Rewards Terms and Conditions" and (2) clicked on the button that stated: "I accept these **conditions**." [Sharp Decl., ¶¶ 13, 41-46; *see also* ; Exhibit B, attached to Sharp Decl. (emphasis added).] Therefore, Gibbs, Myers, and Schoenrock affirmatively agreed to be bound by the PowerUp Rewards Terms and Conditions.

### b. GameStop's PowerUp Rewards Terms And Conditions Incorporated By Reference GameStop's Privacy Policy.

Michigan law provides that "[w]here one writing references another instrument for additional contract terms, the two writings should be read together." *Forge v. Smith*, 458 Mich. 198, 207, 580 N.W.2d 876, 881 (1998); *see also Dow Corning Corp. v. Weather Shield Mfg., Inc.*, 790 F. Supp. 2d 604, 611 (E.D. Mich. 2011) ("Michigan law permits a party to incorporate terms or documents from other writings into their contracts. [Citation.]. Where a contract references another instrument for additional contract terms, it is as though the contents of the referenced writing had been repeated in the contract."). "Neither physical attachment nor specific language is necessary in order for a document to be incorporated into a contract, but the incorporating instrument must clearly evidence an intent that the writing be made a part of the contract." *Dow Corning Corp.*, 790 F. Supp. 2d at 611.

The PowerUp Rewards Terms and Conditions stated: "The information provided by the Member is subject to and will be handled according to the PowerUp Rewards Privacy Policy, available at PowerUpRewards.com." [Sharp Decl., ¶ 15; *see also* Exhibit C, attached to Sharp

Decl.] In other words, the PowerUp Rewards Terms and Conditions referred to the Privacy Policy "for additional contract terms"—namely, how customer information would be handled. Therefore, under Michigan law, the Privacy Policy was incorporated by reference into the PowerUp Rewards Terms and Conditions and must be treated as "though [its] contents…had been repeated in the [PowerUp Rewards Terms and Conditions]."

### c. GameStop's Privacy Policy Expressly Allowed GameStop To Share Gibbs', Myers', And Schoenrock's Information.

Any information sharing that occurred between May 29, 2015 and July 30, 2016 fell squarely within what was permitted by GameStop's Privacy Policy. First, the Privacy Policy allowed GameStop to share customer information that it collected with "third parties," like Experian, Brierley, Lorton Data, and ABC. [Sharp Decl., ¶ 19; *see also* Exhibit D, attached to Sharp Decl.] Second, the Privacy Policy permitted GameStop to share customer information with its "contractors," like Experian, Brierley, Lorton Data, and ABC. [Sharp Decl., ¶ 20; *see also* Exhibit D, attached to Sharp Decl.] In fact, the Privacy Policy stated that while "[t]hese companies and individuals have access to personal information needed to perform their functions,…they are not permitted to use such information for other purposes without our permission." [Sharp Decl., ¶ 20; *see also* Exhibit D, attached to Sharp Decl.] The Experian Contract, the Brierley Contract, Lorton Data's General Terms and Conditions, and the 2015 ABC Rules all included provisions that prohibited them from using Defendants' data for their own purposes without Defendants' permission. [Sharp Decl., ¶¶, 28 24; Exhibits E and F, attached to Sharp Decl.; *see also* Preston Decl., ¶¶ 10, 16; Exhibits N, O, attached to Preston Decl.] Thus, regardless under which provision of the Privacy Policy data sharing with Experian, Brierley, Lorton, and ABC falls, the Privacy Policy allowed it. Therefore, Gibbs, Myers, and Schoenrock provided "written consent" under the VRPA, which defeats their claims.

28

**B.    Plaintiffs' Unjust Enrichment Claim Fails As A Matter Of Law.**

"To succeed on an unjust enrichment claim under Michigan law, the plaintiff is required to prove '(1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party.'" *Coulter-Owens*, 2016 WL 612690, at *5 (quoting *Karaus v. Bank of New York Mellon*, 831 N.W.2d 897, 905 (Mich. Ct. App. 2012)). But "[n]o person is unjustly enriched unless the retention of the benefit would be unjust." *Buell v. Orion State Bank*, 327 Mich. 43, 56, 41 N.W.2d 472 (1950).

In *Coulter-Owens,* the plaintiff there, like Plaintiffs here, based her unjust enrichment claim on the "theory…that retention of the benefit is unjust because defendant violated the VRPA." *Coulter-Owens*, 2016 WL 612690, at *5. [*See also* ECF No. 40, PageID.303, ¶ 95 ("Under principles of equity and good conscience, *because GameStop failed to comply with the VRPA*, GameStop should not be allowed to retain the full amount of money Plaintiffs and the Class paid for their subscriptions or the money it received by transmitting, disseminating, and/or otherwise disclosing Plaintiffs' and the Class's Personal Reading Information.") (emphasis added).] After finding that the plaintiff had failed to prove that the defendant violated the VRPA, the court in *Coulter-Owens* summarily adjudicated the unjust enrichment claim in favor of the defendant because the "plaintiff ha[d] not offered any evidence that establishes an unjust retention of benefits by the defendant." *Coulter-Owens*, 2016 WL 612690, at *5.

The same is true here. Plaintiffs have not and cannot establish that Defendants violated the VRPA by disclosing their information. As such, Plaintiffs have not established any unjust retention of benefits by Defendants. Defendants' Motion for Summary Judgment should be granted.

## VI.  CONCLUSION

Between May 29, 2015 and July 30, 2016, Defendants did not violate the VRPA with respect to any of the Plaintiffs. Therefore, Plaintiffs' VRPA and unjust enrichment claims fail as a matter of law. Defendants' Motion for Summary Judgment should be granted, and the Court should enter judgment against Plaintiffs and in favor of Defendants.

DATED: August 5, 2019

**BAKER & HOSTETLER LLP**

By: */s/ Casie D. Collignon*
    Paul G. Karlsgodt
    Casie D. Collignon
    Matthew D. Pearson

Attorneys for Defendant
GAMESTOP, INC. and SUNRISE
PUBLICATIONS, INC.

## CERTIFICATE OF COMPLIANCE

Defendants hereby certify, pursuant to LCivR 7.2(b)(ii), that the number of words in this brief, including headings, footnotes, citations, and quotations (and excluding the certificates of compliance and service), is 9,060, as determined by Microsoft Word for Office 365 MSO 64-bit.

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2019, I electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** using the CM/ECF system, which will send notification of such filing to all counsel of record.


_____ */s/ Casie D. Collignon* _____